## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

*******************************************
Grace New England, et al.,                *
                                          *
              Plaintiffs,              *
v.                                        *       **Docket No. 1:24-cv-00041-PB-AJ**
                                          *
Weare, NH, Town of, et al.,               *
                                          *
              Defendants.             *
*******************************************

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

Defendants, the Town of Weare, New Hampshire, Craig Francisco, and Tony Sawyer, by and through counsel, Gallagher, Callahan & Gartrell, P.C., hereby submit this Memorandum of Law in Support of Summary Judgment, and state as follows:

### INTRODUCTION AND PROCEDURAL HISTORY

This case concerns the Town's modest efforts to neutrally enforce the Weare Zoning Ordinance (the "Ordinance"), and Plaintiffs' unwillingness to comply with any degree of routine planning and zoning. On February 9, 2024, Pastor Howard Kaloogian and Grace New England Church (collectively, the "Church")[1] initiated this action by filing a Complaint for Declaratory, Injunctive, and Monetary Relief (the "Complaint"). (ECF No. 1.) The Complaint alleges five claims, all arising out of the Church's free exercise of religion.

Following a scheduling conference with this Court, the Parties agreed to stay the case, including discovery and any enforcement efforts from the Town, for ninety days, to explore a

_____

[1] Defendants do not concede that Grace New England has standing to bring this action. Howard and Martha Kaloogian are the owners of the subject property, and, as property owners, bear the obligation of complying with the Weare Zoning Ordinance. Grace New England is merely a domestic non-profit corporation operating on the subject property, but holds no ownership interest.

1

resolution. (ECF No. 31.) The efforts to resolve the case were unsuccessful, and the stay was lifted on July 15, 2024. (ECF No. 32.)

In the intervening months, the Parties have exchanged discovery and taken numerous depositions. The resulting record reveals that the Church's claims have no merit. There is no evidence that the Church's religious exercise has been restrained; no evidence that a substantial burden has been placed on the Church; no evidence that the Church has been treated differently than any other place of assembly, secular or religious; and no evidence that the Town has violated state law when enforcing the Ordinance. Therefore, summary judgment should enter for the Defendants on all counts.

## STATEMENT OF UNDISPUTED FACTS

### (I)     Overview of the Property.

In 2015, Howard and Martha Kaloogian moved to Weare, New Hampshire, looking to purchase a historic home. (Ex. A, H. Kaloogian Depo at 21:5-21.)[2] They ultimately purchased two abutting parcels of land, totaling five acres, and commonly known as 217 Colby Road (the "Property"). (Ex. K, Tax Card; Ex. L, Subdivision Plan.) The Property is located in the Residential Zoning District and is accessed via a Class V local road. (Ex. K, Tax Card; Ex. L, Subdivision Plan.)

The Property features a 200 year-old colonial home that Howard and Martha Kaloogian use as their full-time residence. (Ex. A, H. Kaloogian Depo at 21:19-22:2; 25:5-6.) Only Howard and Martha reside at the Property. (Ex. A, H. Kaloogian Depo at 2:16-26:6.) The Property also features a 200 year-old timber-framed barn on a stacked stone foundation. (Ex. A, H. Kaloogian

---

[2] All record citations refer to the Defendants' Appendix, filed herewith. Documents in the Appendix have been reproduced in their entirety, for the Court's ease of reference, and to present material facts in the context in which they originally existed.

Depo at 22:3-4; 24:4-8.) A single driveway provides access to the house and the barn. (Ex. A, H. Kaloogian Depo at 23:19-20; Ex. L, Subdivision Plan.)

**(II)     Corporate Formation and Affiliation to Establish Church.**

When the Kaloogians purchased the Property in 2015, their only intent was to use it as a primary residence. (Ex. A, H. Kaloogian Depo at 25:10-15.) But in the fall of 2022, the Kaloogians decided that they wanted to establish a church, open to the public, at the Property, specifically in their antique barn. (Ex. A, H. Kaloogian Depo at 47:7-9.) To establish the Church, the Kaloogians became affiliates of Grace International Church and Ministries, Inc. ("Grace International"), a non-profit organization with international reach, having 5600 churches in 130 countries. (Ex. A, H. Kaloogian Depo at 47:13-19, 69:12-19; Ex. F, Subsidiary Church Form.) By affiliating with Grace International, the Kaloogian's new church could open bank and business accounts in the name of the larger organization. (Ex. F, Subsidiary Church Form.) Over the course of six months, Howard Kaloogian participated in classes, interviews, and studies through Grace International to become a licensed minister with the organization. (Ex. A, H. Kaloogian Depo at 47:20-48:18; Ex. F, Subsidiary Church Form.) Grace International also requires background checks, insurance documentation, and annual reporting for indebtedness and staffing for its subsidiary churches. (Ex. A, H. Kaloogian Depo at 50:7-13; Ex. G, Church Indebtedness Form; Ex. H, Staff Information Form.) The Kaloogians also incorporated as a New Hampshire Nonprofit Corporation under the name Grace New England; obtained an employer identification number through the IRS; and opened separate bank accounts for Grace New England to accept donations from congregants. (Ex. A, H. Kaloogian Depo at 49:1-15, 54:2-14; Ex. I, Articles of Agreement for Incorporation; Ex. J, Employee Identification Number Form.)

**(III)     Physical Alterations to the Property to Establish Church.**

In addition to the business considerations to establish the Church, the Kaloogians have made physical alterations to accommodate congregants. The Kaloogians added fourteen pews to their barn, providing seating for approximately 85 people. (Ex. A, H. Kaloogian Depo at 55:23-56:6.) The Kaloogians also hired an individual to clear 180 feet, running along Colby Road, which allows congregants to park along the road. (Ex. A, H. Kaloogian Depo at 27:15-28:8; 60:3-13.) Despite the additional parking – which allows people to enter and exit the roadway from various, new locations – the Kaloogians have not obtained a driveway permit or other review/approval from the Town. (Ex. A, H. Kaloogian Depo at 29:8-10.) For prior events, the Kaloogians had guests use porta-potties, but after establishing the Church, the Kaloogians had a restroom added to the barn. (Ex. A, H. Kaloogian Depo at 40:15-21, 66:13-23.) Despite adding an additional restroom, which sees an increased number of individuals using it, the Kaloogians have not sought review or approval from the Town or NHDES to ensure that the existing septic system can safely handle the increased usage. (Ex. D, C. Francisco Depo at 42:2-24.) The Kaloogians have also installed a heater, paid for by Grace International, to heat the barn and allow services to run through winter. (Ex. A, H. Kaloogian Depo at 51:13-52:11.)

**(IV)     Advertising and Events to Grow the Church's Congregation.**

The Church opened in the summer of 2023 and holds a Saturday evening service and a Tuesday Bible study. (Ex. A, H. Kaloogian Depo at 54:15-55:7.) The Church invited members of the public to attend services by placing an advertisement in the local "Weare in the World" publication. (Ex. CC, Weare in the World Advertisement). The Church also handed out over 100 "You're Invited" cards to people attending a campaign event for Robert F. Kennedy, Jr. that was held at the Property prior to the Church forming. (Ex. DD, Email Detailing Postcards.) The

Church further maintains an email distribution list of approximately 100 people, which provides weekly information to attend the Tuesday Bible study. (Ex. A, Kaloogian Depo at 74:3-16.)

The Church utilizes a public Facebook page and Instagram account, which frequently informs and invites members of the public to regular services and special events at the Property. (Ex. EE, Social Media Posts.) The Church also utilizes a public website – www.gracenewengland.org – which provides information and an invitation to join services and Bible study. (Ex. A, H. Kaloogian Depo at 68:18-21.) The Church is featured on a phone app called the Church Center App, which allows members of the public to search for churches near them, obtain information about services, and donate to individual churches. (Ex. FF, Church Center App; Ex. A, H. Kaloogian Depo at 72:10-74:2.) Howard and Martha Kaloogian do not, themselves, maintain the Facebook page, Instagram account, website, or Church Center App, rather, the parent organization of Grace International/Grace Woodlands is the administrator for these accounts. (Ex. A, H. Kaloogian depo at 68:18-72:9.) Recordings of sermons or information about events at the Church are sent to the parent organization, which then posts the content for the various social media outlets. (Ex. A, H. Kaloogian depo at 70:10-71:12.)

The Church hosts and advertises various special events that are open to the public. Among those events is a Christmas candlelight service, where congregants hold actual candles that are lit from a main candle central source. (Ex. EE, Social Media Posts; Ex. GG, Email Discussing Candlelight Service.) The Church also hosts a movie night on the first Friday of every month. (Ex. EE, Social Media Posts.) In order to show movies to the public, the Church has purchased a Church Video License, which provides authorization to show copyrighted media that would otherwise be limited to personal or private use. (Ex. A, H. Kaloogian Depo at 76:21-

77:14.)[3] The Church Video License is an annual license, which the Church intends to renew for the upcoming year. (Ex. A, H. Kaloogian Depo at 76:21-77:14.) The Church has also served as a host church for a simulcast of a worldwide sermon, and has hosted guest sermons from a highly-regarded missionary from Grace International. (Ex. A, H. Kaloogian Depo at 77:18-79:13.) The Church does not require an RSVP for its regular services or these special events. (Ex. A, H. Kaloogian Depo at 75:11-76:14.)

**(V)    Size of the Church's Congregation.**

At its first Easter service, the Church attracted 71 congregants. (Ex. A, H. Kaloogian Depo at 56:7-13.) At its first Christmas service, the Church attracted 39 congregants. (Ex. A, H. Kaloogian Depo at 56:16-57:3.) The congregation size can fluctuate throughout the year, with an average summer size of 40 congregants, ranging from infants to the elderly, and coming from a geographic area that extends outside the Town of Weare. (Ex. A, H. Kaloogian Depo at 57:4-58:7.) Both Howard and Martha Kaloogian have a goal of growing the Church's congregation even larger. (Ex. A, H. Kaloogian Depo at 58:8-15.)

**(VI)   Local Land Use Regulatory Framework.**

The Church is located in the Residential Zoning District, which authorizes churches as a permitted use. (Ex. M, Ordinance Excerpts § 17.2.1.) Pursuant to a March 1988 Town Meeting, and consistent with the statute now codified as RSA 674:43, the Town properly adopted Site Plan Review Regulations. Consistent with RSA 674:43, the Site Plan Review Regulations require the Planning Board to conduct Site Plan Review for all non-residential uses. (Ex. N, Site Plan Review Regulation Excerpts § I.) Whenever there is any change or expansion of a non-residential use on a property, the property owner must secure approval from the Planning Board

---

[3] *See also* https://us.cvli.com/about/

before any change begins. (Ex. N, Site Plan Review Regulation Excerpts § III.) To apply for Site

Plan Review , a property owner has to complete and submit a one-page form, and designate

whether they wish to appear for a Conceptual Review Meeting or a Design Review Meeting.

(Ex. O, Conceptual Review Form.) Conceptual Review allows the property owner and Planning

Board to have a preliminary conversation and determine if further review will be required. (Ex.

N, Site Plan Review Regulation Excerpts § V.) Depending on the nature of use, a property owner

can seek an expedited review and waivers from criteria and/or document submissions, in order to

streamline the process. (Ex. N, Site Plan Review Regulation Excerpts §§ VII, XV.)

**(VII)** **The Town's Involvement with the Church.**

The Town first became aware of the Church when the Town Administrator, Naomi

Bolton, saw an advertisement in the Weare in the World publication, inviting people to "Come to

Church." (Ex. C, N. Bolton Depo at 33:5-34:22.) Because the Town was not aware that the

Church had opened, on August 23, 2023, Ms. Bolton asked the Zoning Enforcement Officer,

Tony Sawyer, to stop in at the Property to talk with the owner. (Ex. C, N. Bolton Depo at 94:13-

25.)

Prior to learning about the Church during this conversation with Ms. Bolton, Mr. Sawyer

had never heard of the Church or the Kaloogians. (Ex. E, T. Sawyer Depo at 61:21-62:9.)

Typically, upon receiving a complaint or learning of an Ordinance concern, Mr. Sawyer will go

to a property, introduce himself, and start a conversation with the property owners. (Ex. E, T.

Sawyer Depo at 29:13-30:17; 71:20-11.) Because property owners often don't know what the

Ordinance requires, he provides application forms and helps them through the process of fixing

an Ordinance violation. (Ex. E, T. Sawyer Depo at 29:13-30:17; 71:20-11.) On August 23, 2023,

Mr. Sawyer followed this typical approach and visited the Property. Mr. Sawyer had a cordial

visit with Howard Kaloogian that lasted approximately 15 minutes, during which Howard

Kaloogian showed Mr. Sawyer the backyard and barn. (Ex. E, T. Sawyer Depo at 72:12-73:23.)

Mr. Sawyer informed Howard Kaloogian that, if he wanted to continue using the Property for

gatherings, he would need to go to the Planning Board, and Mr. Sawyer provided him with a

copy of the Conceptual Review Form to start that process. (Ex. E, T. Sawyer Depo at 73:15-

74:12; Ex. P, August 23, 2023 Kaloogian Letter to Planning Board.)

The Conceptual Review Form is the "ticket to go to the Planning Board" which explains

to the Planning Board what you intend to do with the property, and provides basic information

such as the owner, address, tax map and lot number, hours of operation, basic septic or parking

information. (Ex. E, T. Sawyer Depo at 73:24-76:14; Ex. O, Conceptual Review Form; Ex. D, C.

Francisco Depo at 71:2-82:20.) This initial information enables the Planning Board to determine

if any further review/action is necessary. (Ex. D, C. Francisco Depo at 71:2-82:20.) Conceptual

Review is also the opportunity for the Planning Board to determine if certain Site Plan Review

application requirements can be waived before doing a formal Site Plan Review. (Ex. D, C.

Francisco Depo at 104:20-105:3.) The Conceptual Review Form is synonymous with the Site

Plan Review Form, and if formal Site Plan Review becomes required, the application allows a

matter to be placed on the Planning Board agenda, to provide public notice, to provide abutter

notice, and for the Planning Board to make decisions by majority vote, consistent with statutory

obligations. (Ex. D, C. Francisco Depo at 103:14-105:3.)

There is no cost associated with the Conceptual Review, nor does an applicant have to

have a survey performed. (Ex. D, C. Francisco Depo at 105:12-17.) As it pertains to the Church,

a prior owner already had a survey prepared for the Property, which depicts the location of

improvements, septic, access points, setbacks, and other relevant information. (Ex. L, Subdivision Plan.)

**(VIII)  The Church's Unwillingness to Participate in Local Review.**

On the same day as Mr. Sawyer's visit, August 23, 2023, Howard Kaloogian sent written correspondence to the Planning Board, informing the Board that the Church would not be submitting a Conceptual Review Form and was not subject to governmental oversight. (Ex. P, August 23, 2023 Kaloogian Letter.) On September 30, 2023, the Planning Board responded, and informed Howard Kaloogian that Site Plan Review would be required if he wanted to continue holding gatherings. (Ex. Q, September 30, 2023 Planning Board Letter.) On October 23, 2023, having received no Conceptual Review Form or other indication of compliance from the Church, the Town Issued a Cease and Desist Letter through it's Zoning Enforcement Officer, ordering the Kaloogians to immediately stop any assembly. (Ex. R, Cease and Desist Letter.) The Church promptly involved legal counsel to challenge any municipal review. (Ex. S, October 27, 2023 First Liberty Letter to Town.) On October 27, 2023, only four days after the Cease and Desist Letter was sent, the Town lifted the Cease and Desist to preserve the status quo while the Church's counsel and Town Counsel conferred about what was required under the Ordinance.[4] (Ex. T, October 2023 Emails). Town Counsel provided further information to the Church's counsel, explaining that non-residential uses are subject to Site Plan Review, and the Church constitutes a non-residential use because it is open to any member of the public, and gatherings occur twice-weekly, week after week, giving rise to concerns about parking, hours of operation, lighting, and safety of those assembling. (Ex. U, December 2023 Town Counsel Emails.)

---

[4] The Cease and Desist Letter has remained lifted throughout the pendency of litigation. However, the Town's current position remains the same, that the Church continues to be in violation of the Ordinance by failing to go through Conceptual Review to assess the non-residential change of use.

**(IX)**    <u>**Safety Concerns Identified by the Town.**</u>

The stated purpose of the Site Plan Review Regulations is to "protect the public health, safety, welfare and prosperity." (Ex. N, Site Plan Review Regulation Excerpts § II.) The barn has only battery-operated smoke detectors opposed to hardwired; has only one traditional wooden interior door, opposed to fire-rated interior doors; and lacks a fire suppression system and emergency exit signs. (Ex. A, H. Kaloogian Depo at 64:19-65:17.) The Kaloogians have not had the local fire department or the State Fire Marshal's Office inspect the barn, nor has the Church received a certificate of occupancy or assembly permit. (Ex. A, H. Kaloogian Depo at 65:18-66:7.)

The propane heater in the barn was installed by Howard Kaloogian. (Ex. A, H. Kaloogian Depo at 67: 21-68:14.) Gas fitting for such a heating system must be installed by a licensed professional, and the initial gas piping professional cancelled the mechanical permit then notified the Town that he did not want to be associated with the work done at the Property. (Ex. Z, Cancelled Mechanical Permit for Heater; Ex. AA, Email from Gas Fitter.) When the Building Code Inspector, Jack Shepard, came to inspect the finished heating system, he observed that the work did not look like it was done by a professional. (Ex. B, J. Shepard Depo at 56:21-57:22.) Mr. Shepard referred the matter to the State Fire Marshal's Office, which has more experience with inspecting gas fittings, and kept the permit open pending the Fire Marshal's review. (Ex. B, J. Shepard depo at 58:20-59:22; Ex. X, Field Report for Heater.)

Naomi Bolton, the Town Administrator, has identified concerns about traffic safety at the Property. Specifically, that Colby Road is a "little street" without enough room for two-way traffic in addition to the congregants' cars parked along the road. (Ex. C, N. Bolton Depo at 52:10-17.) Drivers can be going 35-40 mph on Colby Road, which crests and curves and has no

streetlights, and with the Church meeting in the evening, it is dark while people are going to and from their cars parked along the roadway. (Ex. C, N. Bolton Depo at 50:23-51:11; 99:21-100:7.)

Craig Francisco, the Planning Board Chair, identified concerns about the existing septic on the Property, and whether it can handle increased usage. (Ex. D, C. Francisco Depo at 42:2-43:24.) Specifically, he is concerned with the system being overloaded, resulting in sewage coming out of the ground. (Ex. D, C. Francisco Depo at 42:2-43:24.)

**(X)    Interactions with the Town Following Initiation of Suit.**

While the present litigation was stayed, the Church submitted a request to the Planning Board seeking to waive all Site Plan and/or Change of Use Review regulations. (Ex. V, Request to Waive Regulations.) The Planning Board discussed this request, and asked that the Church come before the Planning Board for a Conceptual Review. (Ex. W, September 30, 2024 Letter re Waiver Request.) The Town further explained that there was no abutter notification and no fee, and the Conceptual Review was a chance for the Church and Planning Board to discuss the request face-to-face. (Ex. W, September 30, 2024 Letter re Waiver Request.) In order to provide the Planning Board with basic information, the letter asked the Church to fill out a one-page form, and then the Church would be placed on the next regularly scheduled Planning Board agenda. (Ex. W, September 30, 2024 Letter re Waiver Request.) The Church declined to fill out this form or to participate in Conceptual Review. Instead, the Church brought this matter before the ZBA. On December 4, 2024, the ZBA denied the request, on the basis that the ZBA lacked jurisdiction to waive the Planning Board's Site Review Regulations. (Ex. X, December 4, 2024 ZBA Decision.)

**STANDARD OF REVIEW**

When ruling on a motion for summary judgment, the Court must "constru[e] the record in the light most favorable to the nonmoving party and resolv[e] all reasonable inferences in that party's favor." *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 301 (1st Cir. 2014). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." *Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F. 3d 196, 199–200 (1st Cir. 1996) (citations omitted). *See also Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011). Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to the material fact has been proved, and "summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

**LEGAL ANALYSIS**

(I)    **The Defendants are entitled to summary judgment on all claims because the allegations are not sufficiently ripe for adjudication and the Church has failed to properly pursue local and state law remedies.**

The Church has bypassed all typical review and appellate procedure for a local land permitting dispute, and has, instead, brought their grievances directly to the Federal Court. By bringing this matter directly and immediately to the Federal Court, the Church is attempting to circumvent the ripeness doctrines and administrative processes that prohibit such claims.

First, the Church has failed to present claims that are ripe for adjudication. In each of its claims, the Church alleges that the application of the Town's Ordinances results in harm that hinders religious expression. (Compl. at ¶¶ 99, 107, 117, 121, 127.) Yet the Church has not participated in any level of municipal review, so it is purely speculative which provision of the

Ordinance would be applied to the Church, or how the Ordinance may interplay with religious expression. Further, the Church has not been impeded from holding any religious service, making it hypothetical to assume that, at some later date, an Ordinance provision could be applied and will restrain religious expression. This fundamental flaw is evidenced in the Complaint, which does not challenge any specific Ordinance provision, and instead makes an amorphous recitation that the application of Ordinances generally causes injury.

In the First Circuit, RLUIPA cases are analyzed under traditional notions of ripeness. *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 91 (1st Cir. 2013). A claim only becomes ripe when there is certainty about the elements of a case, and the facts are final, definite, and sufficiently developed. *Id*. The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship. *Id*. The Church remains in the exact same position today as it was before the Town became aware that it existed – i.e. holding twice-weekly gatherings, growing its congregation, and modifying the Property to accommodate congregants. By bringing claims at this time, the Church impermissibly asks this Court to sit as a "super zoning board," identifying not only what provision of the Ordinance could be applied to the Church, but also how they will be applied, and whether that hypothetical application violates RLUIPA, the State and Federal Constitutions, and state statute. Until such time that the Church actually participates in the local land use process, and there is concreteness about the extent to which the Ordinance will be applied, all of the claims remain hypothetical and unripe for adjudication.

The Church's claims are further flawed because the dispute was not brought before the applicable local Boards and State courts. The September 30, 2023 letter to Howard Kaloogian from the Planning Board required him to submit an application for Site Plan Review. (Ex. Q,

September 30, 2023 Planning Board Letter). This letter was a final decision of the Planning Board involving interpretation and application of the terms of the Ordinance. To any extent the Church wanted to challenge this decision, it needed to be brought as an administrative appeal to the ZBA pursuant to RSA 676:5. To the extent the Church was displeased with the outcome of the administrative appeal, it could appeal the decision to the New Hampshire Superior Court, within 30 days, pursuant to RSA 677:4.

Similarly, when the Church sought a waiver from all Site Plan and/or Change of Use Review regulations during this litigation, the Planning Board requested that the Church first come in for a Conceptual Review. (Ex. W, September 30, 2024 Letter re Waiver Request.) The purpose of the Conceptual Review is to provide a properly noticed public meeting, where the Planning Board can then vote on which waivers may be applicable. (Ex. D, C. Francisco Depo at 67:9-68:25.) The Church did not come in for a Conceptual Review, and did not discuss the request with the Planning Board, and instead brought this matter before the ZBA. (Ex. X, December 4, 2024 ZBA Decision.) The ZBA did not grant relief to the Church, on the basis that the ZBA lacks jurisdiction to prospectively waive Site Plan/Change of Use Review regulations that the Planning Board has not yet heard at a public hearing or voted on. (Ex. X, December 4, 2024 ZBA Decision.) To the extent the Church wanted to challenge the Planning Board's determination that waivers must be heard at a properly noticed public meeting, or wished to challenge the ZBA's determination that it lacked jurisdiction to hear an appeal, the Church needed to bring those grievances to the New Hampshire Superior Court through an RSA 677:4 appeal.

Instead of pursuing proper administrative and state law remedies to redress their claims, the Church has elevated their grievances directly into constitutional claims. The First Circuit has

"repeatedly said that federal courts do not sit as a super zoning board or a zoning board of appeals." *Raskiewicz v. Town of New Boston*, 754 F.2d 38, 44 (1st Cir. 1985). "When the state offers a panoply of administrative and judicial remedies, litigants may not ordinarily obtain federal court review of local zoning and planning disputes . . ." *Id*. Here, the Church is presented with a panoply of remedies – through the local Boards and the New Hampshire Superior Court – which it simply declined to pursue. Whether Site Plan Review is required, and whether specific provisions of the Ordinance should be waived, are squarely matters of local land permitting that this Court should decline to entertain.

(II)    **The Defendants are entitled to summary judgment on Count I, violation of the Free Exercise Clause, because no religious exercise has been infringed upon, and the Town has a compelling interest in protecting public health and safety.**

Even assuming, *arguendo*, that the claims are ripe and this Court has jurisdiction to adjudicate a local land use dispute, the evidentiary record does not support any of the Church's claims. The Church cannot prevail on Count I – a violation of the Free Exercise Clause – because the evidentiary record does not establish any law that infringes upon or restricts practices because of a religious motivation. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532-34 (1993) ("the law . . . is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest.").

As an initial matter, as stated above, the Church broadly refers to "the application of the Town's ordinances" without specifying which Ordinance provisions are at issue. (Compl. at ¶ 98.) This is, of course, because the Church has not participated in any degree of municipal review, so it is unknown which Ordinance provisions could be at issue, or how those provisions could interact with religious practices. To the extent the Church is challenging that Site Plan Review is required at all for non-residential uses, there is nothing in the evidentiary record to

demonstrate that filing the Conceptual Review Form, in and of itself, has or will burden the Church's religious exercise.

What the evidentiary record does establish is that the Church has continued to hold its Saturday service every week, and it's Tuesday Bible study as often as it desires, since the Church opened, without restriction from the Town. (Ex. A, H. Kaloogian Depo at 85:4-12.) Therefore, the Church is unable to establish that its religious exercise has been, or will be, burdened in any way. The evidentiary record further establishes that the Church is a permitted use within the Residential Zoning District, and the relevant witnesses from the Town have expressed no animosity toward the Church or any of its religious practices. (Ex. M, Ordinance Section 17.2.1; Ex. C, N. Bolton Depo at 33:5-34:10; Ex. E, T. Sawyer Depo at 62:23-63:4; 90:1-91:20.)

The evidentiary record further establishes that the Town has valid concerns about health and safety now that the Property hosts intensified, recurrent, and public usage. (Ex. C, N. Bolton Depo at 50:23-52:4; Ex. E, T. Sawyer Depo at 19:2-13; 49:3-50:12; 57:13-20; 108:20-109:14; Ex. D, C. Francisco Depo at 42:2-44:3, 55:17-57:12, 81:1-82:20, 94:12-18.) The Property has changed use from a single-family residence with two occupants, to a place of assembly that is open to the public twice-weekly. Specifically, the Town has raised concerns about increased parking and traffic along a rural road, adequate septic for a new bathroom with increased usage, and adequate life safety for a place of assembly. Maintaining public health and safety have long been held as compelling governmental interests. *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972) ("It is true that activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare . . ."); *Adhi Parasakthi Charitable, Medical, Emotional, and Cultural Society of North America v. Township of West Pikeland*, 721 F.Supp.2d 361, 378 (E.D. Pa. 2010)

(denying Church's motion for summary judgment because the zoning code drew a distinction based on the intensity of use, between large-scale and small-scale uses, not a distinction based on religious use.) *Roman Catholic Archdiocese of Kansas City in Kansas v. City of Mission Woods*, 337 F.Supp.3d 1122, 1139-40 (D. Kan. 2018) ("Generally speaking, case law recognizes that a governmental entity's interest in controlling traffic and reducing noise are compelling interests under RLUIPA."). The Ordinance neutrally requires all properties that have undergone a change in use to participate in municipal review to ensure that traffic, sanitation, and life safety are adequately provided for. This is the least restrictive means to ensure that these compelling governmental interests are achieved.

**(III)** **Defendants are entitled to summary judgment on Count II, a violation of the RLUIPA Substantial Burden provision, because religious expression has not been hindered.**

At present, the only process imposed upon the Church to comply with the Ordinance amounts to filling out a one-page form with basic property information, for which there is no associated cost, and for which no land survey is required, and participating in one Planning Board meeting for a Conceptual Review to determine if further municipal review is necessary. (Ex. O, Conceptual Review Form; Ex. X, C. Francisco Depo at 104:20-105:17.) Even if formal Site Plan Review became necessary, it ordinarily only requires submitting basic property information, which can be demonstrated through existing surveys or a vicinity sketch; information about the property use; abutter notification; and attending a Planning Board meeting to conduct the public hearing. (Ex. Y, Planning Board Approvals for Other Churches.) The application contains an itemized list to walk an applicant through the supporting documentation the Planning Board may require. (Ex. Y, Planning Board Approvals for Other Churches.) To any extent the supporting documentation is inapplicable or unduly burdensome, an applicant can seek

17

to waive those specific documents or items of information. (Ex. Y, Planning Board Approvals for Other Churches.)

When other local churches have gone through Site Plan Review for a change of use, they have been able to represent themselves through the process; have obtained waivers for items that are inapplicable to their review; have received expedited review when requested; and have successfully received approval for the change of use and any associated improvements. (Ex. Y, Planning Board Approvals for Other Churches.) In sum, there is nothing about the ordinary Conceptual Review or Site Plan Review Process that is burdensome. An applicant need only supply basic information, and can seek waivers or expedited review to make the process faster and more tailored to their specific project. And, as those processes have been applied to other religious institutions, the record reflects an expedient process, focused on traditional land planning considerations, devoid of consideration about religious versus secular uses, and for which the other churches obtained approval to change or expand their use.

The modest inconvenience placed on the Church does not amount to a substantial burden for purposes of RLUIPA. While that statute does not define "substantial burden," the First Circuit has applied a "common-usage" understanding of that term. *Signs for Jesus v. Town of Pembroke*, NH, 977 F.3d 93, 111 (2020). "A 'burden' being something that hinders or oppresses, or something oppressive or worrisome, while something 'substantial' is important or significantly great." *Id*. (internal quotations omitted). Decisional law has provided further guidance, that the process of application to a municipal land use board is not sufficient to demonstrate a substantial burden. *See Roman Catholic Bishop of* Springfield, 724 F.3d at 99-100 (holding that the process of applying to a historical commission for review of property does not rise to the level of a substantial burden, even if the property owner could face statutory penalties for making

18

alterations to the property without obtaining approval, and even if the review could ultimately dictate how the property is used.) "The mere existence of some expenses does not put substantial pressure on [the church] to modify its behavior." *Id.* at 99 (citing *Bethel World Outreach Ministries v. Montgomery County Council*, 706 F.3d 548, 556 (4th Cir. 2013).

The Congressional intent behind RLUIPA was never to provide religious institutions with immunity from land use regulations. *Id.* (citing 146 Cong. Rec. S7776 (daily ed. July 27, 2000)). Yet the Church makes precisely that argument, that it should be immune from even the most modest land use regulations. There is nothing oppressive about requiring the Church to fill out a single-page form and have a conversation with the Planning Board. The process of appearing before the Planning Board has done nothing to hinder the Church's religious exercise. As demonstrated by the record, the Church has continued to hold all services without disruption (Ex. A, H. Kaloogian Depo at 85:4-7), and the record is devoid of any indication that the Church would be unable to obtain approvals if/when it properly comes before the Planning Board.

**(IV)**     <u>**Defendants are entitled to summary judgment on Count III, violation of the RLUIPA Equal Terms provision, because the Church has failed to identify secular comparators that have received more favorable treatment.**</u>

"The first step in the RLUIPA 'equal terms' analysis is to identify a relevant secular comparator." *Signs for Jesus,* 977 F.3d at 109. A plaintiff bears the burden of identifying a similarly situated secular comparator, that has received better treatment in regard to a challenged regulation. *Id*. The Church not only fails to identify a relevant secular comparator, but the evidentiary record establishes that secular comparators have received the same treatment by the Town.

The Church points to other public gatherings previously held at the Property as secular comparators, arguing they have received more favorable treatment because they did not have to

go through Site Plan Review. (Compl. at ¶ 32-34.) The first of those "comparators" is an annual observance for the Pine Tree Riot. (Compl. at ¶ 32.) The Pine Tree Riot event happens one day a year in the spring, spans only three hours in the afternoon, and requires an RSVP for attendance. (Ex. II, Invitation to Pine Tree Riot Event; Ex. A, H. Kaloogian Depo at 39:2-41:7.) The second of those "comparators" was a one-time campaign event for Robert F. Kennedy, Jr.'s presidential run. (Compl. at ¶ 33.) The campaign event was held on a single summer day, for a two-hour span during daylight hours, required an RSVP to attend, and had the express permission of neighbors to accommodate the increase in parking for attendees. (Ex. HH, Invitation to Robert F. Kennedy, Jr. Event; Ex. A, H. Kaloogian Depo at 33:13-37:5.) The third of those "comparators" was a backyard wedding. (Compl. at ¶ 34.) As an initial matter, it is doubtful that the wedding can be considered a secular comparator, given that it was a religious service officiated by the pastor of another church. (Ex. A, H. Kaloogian Depo at 42:9-12.) The wedding was a one-day event and only caterers, not wedding guests, utilized the barn. (Ex. A, H. Kaloogian Depo at 42:22-43:11.)

The events the Church points to are not relevant secular comparators. Each of those events occurred on a single day, during a small number of daylight hours, and required an RSVP so there was a known quantity of attendees. In stark contrast, the Church meets year-round every Saturday for services and Tuesday for Bible study. The Church is open to the public, and actively solicits members of the public to join, meaning there is an indeterminate number of people coming and going on any given day. Unlike the "comparators," which are finite events, the Church has goals of growing its congregation and continuing to invite members of the public on a twice-weekly basis. The "comparator" events occurred during daylight hours, when attendees could be outside and the barn doors could be opened, and there would be clear visibility of cars parked along Colby Road. The Church meets on Saturday evenings, including winter months,

when congregants are inside of a closed antique wooden barn with a self-installed heating source, and are parked along a rural route with no added lighting or signage to warn motorists that people may be accessing vehicles. The "comparator" events did not require any changes to the Property, and utilized porta-potties to accommodate guests. The Church has made alterations to the Property, including adding an additional bathroom, without regard to impacts it may have on the septic system. The "comparator" events are dissimilar in nature, but they also do not pose the parking, health, and safety risks that are now presented by the Church.

Further eroding the Church's argument that it has been discriminated against, the Town has required review from the Planning Board in other secular circumstances when a property has changed use. When a woman opened a swap shop and weekly book club in the basement of her residence, and posted a sign advertising "Swap Shop, Meet," the Code Enforcement Officer notified the woman that she would need to seek Planning Board approval. (Ex. E, T. Sawyer Depo at 63:21-65:21.) Planning Board approval was required because people were now invited to meet there on a recurrent basis, and the property had a small driveway on a rural road, which posed a risk of blocking the road. (Ex. E, T. Sawyer Depo at 63:21-65:21.) The Town has also required property owners to come before the Planning Board for a Conceptual Review when those properties added a farm stand, a stand to sell firewood, and a cooler to sell eggs. (Ex. D, C. Francisco Depo at 30:15-19; 73:17-75:19.) The Town has also sent Cease and Desist Letters to secular uses when those property owners are in violation of the Ordinance. One such instance was when an individual had a porta-potty next to a brook which posed health issues. (Ex. E, T. Sawyer Depo at 86:6-87:4.) Another such instance was when an individual was running an Airbnb out of his house, which must first be authorized by the ZBA. (Ex. E, T. Sawyer Depo at 35:2-21.)

The Church has been treated in the same regard as secular uses within the Town – when there is a change of use from purely residential to offering a service to the public, no matter how minor, a property owner is required to come before the Planning Board for a Conceptual Review. When there is a failure to comply with the Ordinance or to get proper municipal approval, the Town sends a Cease and Desist Letter. "If religious and secular land uses . . . are treated the same . . . that is enough to rebut an equal-terms claim." *Sign for Jesus*, 977 F.3d at 110.

**(V)    Defendants are entitled to summary judgment on Count IV, a violation of RSA 674:76, because no action from the Town has violated the plain language or intent of the statute.**

Throughout litigation, the Church has taken a position that RSA 674:76 prevents any municipal review of the Property. Neither a plain reading of RSA 674:76, nor the legislative intent, support this contention. RSA 674:76 was enacted on July 1, 2022, and during its brief time in existence, there has been no decisional law to provide guidance on its interpretation. This statute is also subject to pending legislation that seeks to repeal the statute in its entirety. *See* SB265, https://gc.nh.gov/bill_Status/billinfo.aspx?id=1122&inflect=2.[5] The Church is asking this Federal Court to be the first, of any judicial body, to interpret a state law statute, which is presently in a state of flux, and in a circumstance where the local municipality has not yet had opportunity to apply the statute. The statute currently reads as follows:

> No zoning ordinance or site plan review regulation shall prohibit, regulate, or restrict the use of land or structures primarily used for religious purposes; provided, however, that such land or structures may be subject to objective and definite regulations concerning the height of structures, yard sizes, lot area, setbacks, open space, and building coverage requirements as long as said requirements are applicable regardless of the religious or non-religious nature of the use of the property and do not substantially burden religious exercise. (emphasis added.)

---

[5] Sen. Prentiss, a sponsor for SB265, argued that the current statute usurps local control of land regulation. The New Hampshire Municipal Association, which supports the bill to repeal RSA 676:74, stated that there was a compelling interest for municipalities to subject a religious property to site plan review requirements equally with everyone else, citing considerations such as lighting, noise, drainage, erosion, and sediment control.

The plain language of RSA 674:76 makes clear that there are, at least some, objective and definite regulations that a municipality may consider, regardless if the property is used primarily for religious purposes. There is nothing in the evidentiary record to establish that the Town has applied any regulation beyond the enumerated list in this statute. There is also nothing in the evidentiary record to establish that the Town has applied regulations in a way that distinguishes between a religious and non-religious use.

The legislative history of RSA 674:76 provides further guidance that the statute intended to put religious uses on an equal footing with non-religious uses, not to make religious uses entirely exempt from municipal review, as the Church has argued. The Statement of Intent clearly states that "the bill simply requires that land use laws be applied equally to all permitted uses without additional requirements based on religious use of the property." *See* House of Representatives Committee on Judiciary (February 3, 2022) at *2 (available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://gc.nh.gov/BillHistory/SofS_Archives/202 2/house/HB1021H.pdf). Representative Wuelper, a sponsor for the bill, further explained that the purpose of the bill was to protect against "additional and/or unusual restrictions" and to "prohibit localities from using religious use, belief, or practice as a condition in their land use ordinances." *Id*. at 6. There is nothing in the evidentiary record to suggest that the Church has been subjected to additional or unusual requirements. There is also nothing in the evidentiary record to suggest that the Town requires site plan review on the basis of religious use, belief, or practice. To the contrary, the evidentiary record establishes that the Town is attempting to hold the Church to the same objective and neutral land use regulations as any other property owner that changes the use of their property, consistent with the intent of the law.

**(VI)** **Defendants are entitled to summary judgment on Count V, a violation of Part I, Art. 5 of New Hampshire Constitution, because religious exercise has not been burdened, and the Town has a compelling interest in protecting public health and safety.**

Count V raises the same elements and arguments presented in Counts I and II, and therefore, requires little further discussion. Count V raises issues addressed above: whether the Town has a compelling governmental interest in enforcing regulations that provide for public health and safety, and whether those regulations have substantially burdened the Church's religious exercise. As outlined further above, the Town has a compelling interest in ensuring that traffic safety, fire safety, and sanitation are adequately regulated. Requiring all property owners to undergo, at a minimum, preliminary Conceptual Review to ensure those health and safety issues are adequately addressed, is the least restrictive means to achieve that objective. As further outlined above, the evidentiary record demonstrates the Church's religious exercise has not been burdened or restrained in any manner.

**(VII)** **Defendants Francisco and Sawyer are entitled to summary judgment because their official capacity claims are duplicative and there is insufficient evidence to support claims against them.**

It is well established that a suit against a town officer in his official capacity is the same as a suit against the town. *See e.g., Signs for Jesus v. Town of Pembroke*, Case No. 15-cv-482-PB, Opinion No. 2016 DNH 059 at * 3 (analyzing official-capacity claims). Accordingly, the official capacity claims against Defendants Francisco and Sawyer are duplicative of those against the Town, and should not remain in this action.

The individual capacity claims against Defendants Francsico and Sawyer are similarly deficient. Defendant Francsico's singular activity was signing a letter, sent on behalf of the Planning Board, informing the Church that it would need to participate in Site Plan Review. (Ex. Q, September 30, 2023 Planning Board Letter to Kaloogian.) Defendant Sawyer's singular

activities were a fifteen-minute cordial discussion with Howard Kaloogian, and issuing a Cease and Desist Letter in the ordinary course after months of non-compliance from the Church, which was withdrawn only four days later. (Ex. E, T. Sawyer Depo at 58:23-59:10; Ex. P, August 23, 2023 Kaloogian Letter to Planning Board; Ex. R, October 23, 2023 Cease and Desist Letter.) Enforcement of planning and zoning regulations, absent some additional evidence of misconduct, does not form a basis for individual liability against municipal officers, and there is nothing in the evidentiary record to suggest that they were motivated by animus or discriminatory intent toward the Church.

Respectfully submitted,

**TOWN OF WEARE, NEW HAMPSHIRE**
**CRAIG FRANCISCO**
**TONY SAWYER**

By Their Attorneys,

**Gallagher, Callahan & Gartrell, P.C.**

Dated: March 28, 2025          */s/ Emily C. Goering*
                               Emily C. Goering, NH Bar No. 268497
                               Robert J. Dietel NH Bar No. 19540
                               214 North Main Street
                               Concord, NH  03301
                               603-545-3613 / 603-545-3613
                               Goering@gcglaw.com
                               Dietel@gcglaw.com

## CERTIFICATE OF SERVICE

I, Emily C. Goering, hereby certify that a copy of the foregoing was sent to all counsel of record via ECF.

Dated: March 28, 2025          */s/ Emily C. Goering*
                               Emily C. Goering