# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

GRACE NEW ENGLAND; and

PASTOR HOWARD KALOOGIAN,

       Plaintiffs,

  v.

TOWN OF WEARE, NEW HAMPSHIRE;

TONY SAWYER, in his individual and
official capacities; and

CRAIG FRANCISCO, in his individual and
official capacities,

       Defendants.

**Civil Action No.: 1:24-cv-00041-PB-AJ**

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

CONCISE STATEMENT OF MATERIAL FACTS ....................................................3

    I.      Pastor Kaloogian moves to New Hampshire, uses his home for community gatherings, and begins operating the Church. ...........................................................3

    II.     The Town engages in a coordinated effort to force the Church to obtain site plan approval before engaging in religious activities at Pastor Kaloogian's home. ....................................................................................................4

STANDARD OF REVIEW .............................................................................................8

ARGUMENT ...................................................................................................................9

I.    The Town's application of its Regulations violates RSA 674:76's plain text and history. ....................................................................................................................9

II.    The Town's application of its Regulations violates the First Amendment's Free Exercise Clause. ......................................................................................................15

        III.    The Town's application of its Regulations violates RLUIPA's Substantial Burden and Equal Terms provisions. .....................................21

    A.     Substantial Burden provision. ................................................................21

    B.     Equal Terms provision. .........................................................................24

IV.   The Town's application of its Regulations violates the New Hampshire Constitution. ...........................................................................................................25

CONCLUSION .............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bay Farm Montessori Acad., Inc. v. Town of Duxbury*,
    912 N.E.2d 1040 (Mass. App. Ct. 2009) ...............................................................14

*Bible Speaks v. Bd. of Appeals of Lenox*,
    391 N.E.2d 279 (Mass. App. Ct. 1979) ................................................................14

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993).............................................................16, 18, 19, 23

*Faiella v. Fed. Nat'l Mortg. Ass'n*,
    928 F.3d 141 (1st Cir. 2019)...............................................................9

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021)....................................................................16, 17, 18

*Giguere v. Port Res. Inc.*,
    927 F.3d 43 (1st Cir. 2019)..................................................................9

*Groff v. DeJoy*,
    600 U.S. 447 (2023)........................................................................9, 11

*Hardt v. Reliance Standard Life Ins. Co.*,
    560 U.S. 242 (2010)............................................................................9

*Holt v. Hobbs*,
    574 U.S. 352 (2015).........................................................................23

*Int'l Church of Foursquare Gospel v. City of San Leandro*,
    673 F.3d 1059 (9th Cir. 2011) ...............................................................24

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022)..........................................................15, 16, 17, 18

*Konikov v. Orange Cnty.*,
    410 F.3d 1317 (11th Cir. 2005) ............................................................25

*Kravitz v. Purcell*,
    87 F.4th 111 (2d Cir. 2023) .................................................................16

*Mast v. Fillmore Cnty.*,
    141 S. Ct. 2430 (2021).....................................................................20, 23

*N.H. Fin. Auth. v. Chown,*
  2007 WL 1321695 (D.N.H. May 4, 2007)............................................................9

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
  583 U.S. 109 (2018)............................................................................................9

*Penobscot Nation v. Frey,*
  3 F.4th 484 (1st Cir. 2021)............................................................................9, 11

*Petrucci v. Bd. of Appeals of Westwood,*
  702 N.E.2d 47 (Mass. App. Ct. 1998) ..............................................................14

*Roman Cath. Bishop of Springfield v. City of Springfield,*
  724 F.3d 78 (1st Cir. 2013)...............................................................................22

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020).............................................................................................20

*S. Bay United Pentecostal Church v. Newsom,*
  141 S. Ct. 716 (2021).........................................................................................15

*Signs for Jesus v. Town of Pembroke,*
  977 F.3d 93 (1st Cir. 2020)................................................................................24

*St. Paul's Found. v. Ives,*
  29 F.4th 32 (1st Cir. 2022).................................................................................22

*State v. Mack,*
  249 A.3d 423 (N.H. 2020)............................................................................25, 26

*Tandon v. Newsom,*
  593 U.S. 61 (2021).......................................................................................18, 20

*Town of Westport v. Monsanto Co.,*
  877 F.3d 58 (1st Cir. 2017)..................................................................................9


**Statutes**

42 U.S.C. § 2000cc .............................................................................2, 21, 23, 24

42 U.S.C. § 2000cc-5 .............................................................................................21

N.H. Rev. Stat. § 674:43 ..........................................................................................1

N.H. Rev. Stat. § 674:76 ............................................................................... *passim*

N.H. Rev. Stat., Title 12...............................................................................12, 21

iv

N.H. Rev. Stat., Title 64 .................................................................................................12

Mass. Gen. Laws Ann. ch. 40A, § 3 ...............................................................................14

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................ *passim*

N.H. Const. part I, art. 5 ...................................................................................... *passim*

**Other Authorities**

N.H. House Bill No. 1021 (Final Version, 2022 Session) ......................................11, 12

N.H. House Bill No. 1021 (as introduced Jan. 5, 2022) .............................................11

## INTRODUCTION

Since moving to Weare, New Hampshire, Pastor Howard Kaloogian has spent countless time and resources to both bring the community together and spread the gospel.  From hosting well-attended political events to bringing together a small group for an intimate Bible study, Pastor Kaloogian has sought to make a difference in others' lives.  Perhaps his biggest leap of faith was to follow God's calling to open a church—Grace New England.

Given Pastor Kaloogian's history of hosting a wide range of events, public and private, small and large, he thought there would be no issue with hosting small religious services using the largest room at his home, the renovated barn.  Indeed, the Town of Weare's Planning Board had already indicated that such gatherings would be acceptable and not subject to further regulation. But once the Pastor Kaloogian and Grace New England (collectively, the "Church") started to host religious gatherings, Defendants Town of Weare, New Hampshire, Tony Sawyer, and Craig Francisco (collectively, the "Town") engaged in a coordinated effort to stop them using all the petty tools of government at their disposal.  While allowing others in the community to meet for a variety of secular reasons, the Town has now determined that the Church needs to undergo an extensive and onerous site plan process before hosting religious gatherings.  This came as a surprise because the Church did not think it was controversial to host peaceful and intimate gatherings on the property, as others across the community, and even Pastor Kaloogian himself, have done.  However, the Town brought increased pressure on the Church to comply with its demands, threatening significant fines, and legal action unless the Church complied with a set of regulations, namely the Weare Site Plan Review Regulations, authorized by N.H. Rev. Stat. § 674:43, and the Town's Zoning Ordinance (collectively, the "Regulations").  Because the Town does not intend to follow (i) a clear statutory mandate telling it to refrain from the at-issue conduct, or (ii) a long line of constitutional authority prohibiting the at-issue conduct, the Church hereby

submits this Motion for Summary Judgment (the "Motion").

After engaging in discovery, it is even more clear that both state and federal law protect the Church's religious activities. First, an unambiguous state statute—N.H. Rev. Stat. § 674:76 ("RSA 674:76")—prohibits the Town from applying the Regulations in the very manner it seeks to do here. The Town maintains that the Church needs to submit a site plan review for the use of a barn that is primarily used for religious purposes, which is in direct contradiction of RSA 674:76's plain reading. Second, the Town violates the Church's First Amendment right to freely exercise its religion. U.S. Const. amend I. Given that the Town's Regulations either (i) grant sole discretion based on individualized determinations or (ii) treat comparable secular activity more favorably than religious exercise, they are not neutral and generally applicable and are therefore subject to strict scrutiny. And while the Regulations must be the least restrictive means of furthering a compelling interest, the Town falls well short of meeting that demanding standard. Next, the Town's conduct violates two of the Religious Land Use and Institutionalized Persons Act's ("RLUIPA") key provisions by imposing a substantial burden on the Church's free exercise of religion and applying its Regulations in a manner that violates RLUIPA's equal terms provision. 42 U.S.C. §§ 2000cc(a), 2000cc(b). As to either provision, the Town cannot overcome RLUIPA's strict scrutiny analysis. Finally, by violating the First Amendment's Free Exercise Clause, the Town also violates the New Hampshire Constitution. N.H. Const. part I, art. 5. And, regardless, there remains an independent violation of the New Hampshire Constitution.

The Church is entitled to relief declaring that the Town's application of its Regulations against the Church violates: (1) RSA 674:76; (2) the First Amendment's Free Exercise Clause; (3) RLUIPA's Substantial Burden and Equal Terms provisions; and (4) Part I, Article 5 of the New Hampshire Constitution. The Church is entitled to relief enjoining the Town from taking further

steps to enforce the Regulations against the Church, among other relief as the Court deems proper. The Court should grant this Motion in its entirety and enter judgment in the Church's favor.

## CONCISE STATEMENT OF MATERIAL FACTS

### I.     Pastor Kaloogian moves to New Hampshire, uses his home for community gatherings, and begins operating the Church.

Pastor Kaloogian moved to the Town in 2015.  Dkt. 24-2, Affidavit of Howard Kaloogian ("Kaloogian Aff.") ¶ 3.  His home, situated on a spacious five-acre plot, consists of two main buildings: the primary residence and a renovated barn.  *Id.* ¶ 4.  The barn used to be a woodshop and party barn—well-known in the community for hosting acclaimed parties from the previous property owner—but has since undergone significant renovations.  *Id.* ¶¶ 5–6.  Now, the renovated barn consists of pews, a pulpit, and an upgraded heating system.  *Id.*  Pastor Kaloogian has also renovated the property to accommodate visitors, such as installing a retaining wall to allow off-street parking.  *Id.* ¶ 7.  He purchased his home with the intention of hosting events.  *Id.* ¶ 8.

But before hosting these events, Pastor Kaloogian and his wife went before the Town's Planning Board to present their idea.  Kaloogian Aff. ¶ 9; Ex. 1, Howard Kaloogian Dep. at 45:15–23.  After learning of the Kaloogians' plan to host events, the Town did not take any action to require a site plan for the Property for many years.  Kaloogian Aff. ¶¶ 9–11.  Thus, the Kaloogians proceeded with their plan to host events at their home, including their barn, for the next several years.  *Id.* ¶ 11; Ex. 1, Kaloogian Dep. at 32:4–45:4.

Many of these events included non-religious gatherings.  For example, the Kaloogian's used the barn as the annual meeting place for an observance of the annual Pine Tree Riot—an event widely promoted by the community organization Americans for Prosperity.  Kaloogian Aff. ¶ 11.  The property has also supported a range of political and social events.  One of those events consisted of a visit from the well-known politician Robert F. Kennedy, Jr. and garnered hundreds

of community members in attendance. Kaloogian Aff. ¶ 11. Another included at least one wedding, in which the barn was used as part of the event. *Id.* Other social events hosted in their home were less formal, including pinochle games or backgammon tournaments. *Id.*

Additionally, their home played host to many other events related to religious gatherings. For example, Pastor Kaloogian started to host weekly Bible studies in his family room with roughly 20 people in attendance. Kaloogian Aff. ¶ 12. Pastor Kaloogian also met with other Church members in other parts of his home to counsel and engage in fellowship, including hosting Thanksgiving meals and engaging in communion in his kitchen and dining room. *Id.*

In 2022, Pastor Kaloogian began prayerfully considering what else he could use his home for to glorify God. Kaloogian Aff. ¶ 13. Based on a sincere religious belief that God called him to begin a church, Pastor Kaloogian started a small church plant in the summer of 2023. *Id.* An average of 25–30 people attend services at the Church each week. *Id.* ¶ 14. Pastor Kaloogian has installed 14 pews in his barn, which can seat up to 85 people. Ex. 1, Kaloogian Dep. at 56:3–6. Because of the congregation's small size, the Church cannot yet afford to move to a larger space, but Pastor Kaloogian does plan to find a different location should the Church continue to grow. Kaloogian Aff. ¶ 14. While Pastor Kaloogian still hosts events from time to time, the primary, and nearly sole, use of his barn is dedicated to religious use since starting his church. Decl. of Howard Kaloogian in Supp. of Pls. Mot. for Summ. J. ("Kaloogian Decl.") ¶¶ 7–10.

## II.    The Town engages in a coordinated effort to force the Church to obtain site plan approval before engaging in religious activities at Pastor Kaloogian's home.

On August 23, 2023, Pastor Kaloogian received an unannounced visit from Tony Sawyer, Zoning Officer for the Town. Kaloogian Aff. ¶ 14; Ex. 2, Tony Sawyer Dep. at 71:20–22. Mr. Sawyer visited the Property after his supervisor, Naomi Bolton, saw an advertisement for a church gathering at Pastor Kaloogian's home address and directed Mr. Sawyer to investigate the church.

Ex. 3, Naomi Bolton 30(b)(6) Dep. ("30(b)(6) Dep.") at 33:9–24; Ex. 2, Sawyer Dep. at 69: 15–24. That same day, Mr. Sawyer visited the Property and informed Pastor Kaloogian that his religious gathering violated the Town's ordinances because he had not obtained approval from the Town's Planning Board or submitted a site plan. Ex. 2, Sawyer Dep. at 73:8–23. Mr. Sawyer then provided Pastor Kaloogian with a form entitled "Planning Board Application for Conceptual or Design Review," and told him to submit it for consideration at an upcoming Planning Board meeting. *Id.*; Ex. 4, Town of Weare Planning Board Application.

After Mr. Sawyer's visit, Pastor Kaloogian sent a letter to Chairman Craig Francisco documenting what had occurred. Ex. 5, Aug. 23, 2023 Letter. Pastor Kaloogian also expressed concerns that completing the form would be contrary to the U.S. Constitution and the Town's zoning ordinances. *Id.* In his letter, Pastor Kaloogian outlined the many events that had transpired on his property in the past several years, many of which were widely promoted in the Town. *Id.* As to the local zoning ordinances, Pastor Kaloogian's letter called attention to Section 17.2.1, which explicitly noted that churches are permitted as of right in districts zoned residential. *Id.* Considering this, and the fact that he believed the First Amendment protected the Church's gathering, Pastor Kaloogian respectfully declined to submit the provided form. *Id.* The Church, therefore, continued gathering on a weekly basis. About a month later, the Town sent a letter to Pastor Kaloogian informing him that the Planning Board determined that he would need to apply for a Site Plan to continue gathering as a church. Ex. 6, Sept. 30, 2023 Letter. The letter outlined certain Site Plan Regulations that allegedly applied to the Church. *Id.* Nonetheless, Pastor Kaloogian maintained the Town's application of the Regulations violated state and federal law.

In October 2023, preparing for the upcoming winter, Pastor Kaloogian purchased a propane-powered radiant heater designed for barns like his. Kaloogian Aff. ¶ 23. Although he

was able to hang the unit himself, Pastor Kaloogian asked a licensed plumber to obtain a permit from the Town so that the unit could be connected to a gas line. *Id.*; Ex. 1, Kaloogian Dep. at 67:21–68:14.  The Town initially refused to issue the permit forms to the plumber.  Kaloogian Aff. ¶ 23.  While permit issues continued, the Town sent another letter, on October 23, 2023, demanding that Pastor Kaloogian "Cease and Desist on [his] property" and "immediately stop any assembly regarding Grace New England Church."  Ex. 7, Oct. 23, 2023 Cease and Desist.  The letter indicated that the cease-and-desist notice "will remain in effect until a site plan is submitted, reviewed and there is a decision made by the Town Planning Board."  *Id.*  The letter also indicated that Pastor Kaloogian would be subject to significant daily fines for non-compliance—$275 for the first offense and $550 for subsequent offences each day that such violation is found.  *Id.*  In response, Pastor Kaloogian retained legal representation and answered the cease-and-desist notice three days later.  Ex. 8, Oct. 27, 2023 Letter.  Counsel detailed how the notice violated the Free Exercise Clause, treats religious activity worse than comparable secular gatherings in individual homes, and runs afoul of the Town's own zoning ordinances.  *Id.*  The next day, on October 27, 2023, the cease-and-desist order was lifted temporarily.  Dkt. 1, Compl., Ex. F.

The Town's attorney responded to counsel's letter on December 10, 2023.  The attorney indicated that "use of the barn to hold religious services requires site plan approval, just as any other non-residential use would require."  Dkt. 1, Compl., Ex. G.  The Town's attorney further explained that church services are different from other gatherings that might occur at one's home because the public may attend the Church.  *Id.*  The Town again demanded that Pastor Kaloogian apply for site plan approval, or the Town may "seek the assistance of the Hillsborough County Superior Court to require him to do so."  *Id.*

Also in December 2023, Pastor Kaloogian's plumber received the permit to connect the gas line to his new radiant heater. Kaloogian Aff. ¶ 32. Bob Clark, one of the Town's building inspectors, then came to the property and approved the gas line connection. *Id.* But Mr. Clark did not grant final approval, rather Mr. Clark noted that he needed time to read the radiant heater's manual and promised to return with the fire chief. *Id.* Neither Mr. Clark nor the fire chief revisited. In late January, after speaking with one of the Town Board of Selectmen members, Pastor Kaloogian submitted a letter to the Town Board of Selectmen. Kaloogian Aff. ¶ 33. The letter explained his concerns that the Town's employees were interfering with his right to engage in worship at his property. Dkt. 1, Compl., Ex. I. Pastor Kaloogian noted that his home—his residence and the barn—are not "church buildings" but are simply where the church meets. *Id.* Pastor Kaloogian reiterated that he has held many community events without issue and asked if the Board of Selectmen agrees with Mr. Sawyer and Mr. Francisco's position. *Id.*

On February 5, 2024, the Board of Selectmen met to discuss several agenda items, including Pastor Kaloogian's letter. *See* Weare Channel 6, "Board of Selectmen – February 5, 2024," YouTube (Feb. 5, 2024) (the "Video"), *available at* https://www.youtube.com/watch?v=_-C6a4E46UQ. The Board of Selectmen discussed an upcoming February 10, 2024 deadline for Pastor Kaloogian to respond about the Town's position regarding filing a site plan application that was agreed to by each party's attorneys. *Id.* at 1:28–1:37. One member referenced a New Hampshire statute, which states that "no zoning ordinance or site plan review regulation shall prohibit, regulate or restrict the use of land or structures primarily used for religious purposes." RSA 674:76; Video at 1:32:28–1:33:28, 1:34:44–49. The Board of Selectmen then discussed whether this statute had been considered but did not resolve this open question.

Two days after the Board of Selectmen meeting, Jack Shephard, acting as an inspector for the Town, arrived to inspect the installed radiant heater.  Ex. 9, Jack Shephard Dep. at 55:13–59:22.  He noted that the radiant heater needed minor corrections, such as smoothing crinkled joint tape, but then clarified that as a place of public assembly, he was required to notify the state fire marshal about the Church's gatherings.  *Id.*; Kaloogian Aff. ¶ 36.  In that regard, Mr. Shephard indicated that the radiant heater failed to get the room to 72-degrees, as would be required by the fire marshal, in the short time that he was there, and the lack of insulation could be an issue.  Kaloogian Aff. ¶ 36.  Around a month after inspecting the radiator, Mr. Shephard emailed the New Hampshire State Fire Marshal raising his fire safety concerns.  Ex. 10, Defs. 0277–78.  To date, the State fire marshal has taken no action on Mr. Shephard's complaint.

With the looming February 10, 2024 deadline, and the town attorney's threat of a lawsuit to force Pastor Kaloogian's compliance with the Zoning Board's demands, the Church and Pastor Kaloogian filed the instant lawsuit.  In August 2024, the Church submitted a written request to the Town's Planning Board to waive the application of its site plan regulations to the Church.  Ex. 11, Aug. 21, 2024 Request.  One month later, the Town sent Pastor Kaloogian a letter declining the waiver request and instead directing him to fill out the same site plan application he received from Mr. Sawyer in August 2023.  Ex. 12, Sept. 30, 2024 Letter.  In response to this action, Pastor Kaloogian elevated his request to the Town's Zoning Board, which denied this request in December 2024 based on purportedly lacking jurisdiction.  Ex. 13, Dec. 4, 2024 Notice.

## STANDARD OF REVIEW

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 145 (1st Cir. 2019).  "A genuine issue of material fact only exists if a reasonable factfinder . . . could resolve the dispute in that

party's favor." *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 64−65 (1st Cir. 2017) (cleaned up).  A case that "presents a pure legal question" is ripe for decision at summary judgment.  *N.H. Fin. Auth. v. Chown*, 2007 WL 1321695, at *1 (D.N.H. May 4, 2007).  When the parties file cross-motions for summary judgment, the court views "each motion separately, drawing all inferences in favor of the nonmoving party."  *Giguere v. Port Res. Inc.*, 927 F.3d 43, 47 (1st Cir. 2019).

**ARGUMENT**

The undisputed facts show that the Town has violated both state and federal law. Specifically, the Town's conduct runs afoul of: (1) RSA 674:76; (2) the First Amendment's Free Exercise Clause; (3) RLUIPA's Substantial Burden and Equal Terms provisions; and (4) Part I, Article 5 of the New Hampshire Constitution.  For the following reasons, the Court should grant this Motion in its entirety and enter judgment in the Church's favor.

**I.      The Town's application of its Regulations violates RSA 674:76's plain text and history.**

This matter begins, and likely ends, with the Town's blatant disregard of a state statute—RSA 674:76.  Courts are required to "enforce plain and unambiguous statutory language according to its terms."  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010).  The Supreme Court has "stressed over and over again" that "statutory interpretation must begin with, and ultimately heed, what a statute actually says."  *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (cleaned up); *see Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018) (noting that where the statutory language is "unambiguous" the "inquiry begins with the statutory text, and ends there as well") (citation omitted).  The First Circuit routinely follows this familiar and commonsense approach.  *See Penobscot Nation v. Frey*, 3 F.4th 484, 490−91 (1st Cir. 2021).

The relevant statute reads:

> No zoning ordinance or site plan review regulation shall prohibit, regulate, or restrict the use of land or structures primarily used for religious purposes; provided, however, that such land or structures may be subject to objective and definite

9

> regulations concerning the height of structures, yard sizes, lot area, setbacks, open spaces, and building coverage requirements as long as said requirements are applicable regardless of the religious or non-religious nature of the use of the property and do not substantially burden religious exercise.

RSA 674:76. This statutory language could not be plainer and more unambiguous. The first portion of this statute can be broken up into three sections: (1) "No zoning ordinance or site plan review regulation shall prohibit, regulate, or restrict"; (2) "the use of land or structures"; and (3) "primarily used for religious purposes." *Id.* Each of these three sections apply to the Town's application of its Regulations against the Church.

First, there can be no dispute that the Town is applying its "zoning ordinance" and "site plan review regulation" against the Church. *See, e.g.*, Ex. 2, Sawyer Dep. at 105:15–18 ("The town is saying that the site plan's required, and Mr. Kaloogian is saying he doesn't need to have one."); Dkt. 1, Compl., Ex. G (indicating that "all non-residential uses in Weare require site plan approval"); Dkt. 34, Defs.' Answer To Pls.' Compl. ¶ 5 (admitting that Pastor Kaloogian needs "to submit an application for site plan approval per the Town's ordinances"). The Town's application of its Regulations against the Church can be plainly described as prohibiting, regulating, and restricting. *See, e.g.*, Dkt. 1, Compl., Ex. D (Planning Board letter noting that he would need to apply for a site plan for "religious and/or other gatherings"); Dkt. 1, Compl., Ex. A (cease and desist letter telling the Church to stop "any assembly regarding Grace New England Church"). In fact, the Town's corporate representative admitted this. *See* Ex. 3, 30(b)(6) Dep. at 84:16-18 ("We're just regulating like we regulate every other piece of property in town."). Second, there can be no dispute that Pastor Kaloogian's barn, the structure where the services are held, is the subject of the Town's Regulations. The Town's corporate representative and its zoning officer admit this point. *See* Ex. 3, 30(b)(6) Dep. at 85:7−9 ("I think the definition of structure in article 4 would, yes, fall into his barn being a structure."); Ex. 2, Sawyer Dep. at 113:14−23 (Q. "[W]hen

you were the zoning officer, had you ever taken action against a residential property where . . . the property owners was using a separate structure – like here it's a barn – to hold church services?" A. "No. This is the first experience for me where church 'services' were being held in a structure."). Finally, there can be no dispute that, from the moment Pastor Kaloogian created his church to the present, his barn has been primarily used for religious purposes. *See* Kaloogian Decl. ¶¶ 7−10. And even the Town's zoning officer was told by the Town's corporate representative that Pastor Kaloogian's barn was being used for "church services." *See* Ex. 2, Sawyer Dep. at 114:21−25 ("[M]y analysis was basically given to me from Naomi Bolton that what the current – what the use was being for is it was a barn being – held church services and with several people."). Given that each section (i) is plain and unambiguous and (ii) clearly applies to the Town's application of its Regulations, the inquiry must end. *See Groff*, 600 U.S. at 468.

While RSA 674:76's "text is unambiguous" and the Court need not "look to legislative history" or "intent," *Penobscot Nation*, 3 F.4th at 491, doing so here further bolsters the plain reading of the statute. House Bill 1021—titled prohibiting certain zoning regulation of land or structures used primarily for religious purposes—was introduced to the New Hampshire legislature in 2022. *See* Ex. 14, New Hampshire House Bill No. 1021, New Hampshire Second Year of the One Hundred Sixty-Seventh Session of the General Court ("HB 1021"). When introduced, the statement of findings and purpose made clear this bill was "necessary to statutorily clarify that no municipality may regulat[e] religious land use based on the religious nature of the assembly or the religious nature of the speech taking place on the land or in the structure." Ex. 15, HB 1021 (as introduced). The sponsor of the bill testified that one of the main reasons he introduced HB 1021 was because he knew people "who were having difficulty with their local land use people about the number of people they could have in their house for a prayer meeting" and wanted to eliminate

the situation where a "home church" is forced to go to court to be able to practice its religion. *See* Senate Election Law and Municipal Affairs Hearing at 4:58−8:31 (Mar. 21, 2022), *available at* https://www.youtube.com/watch?v=TPk45scqsUM&list=PLXcUNufNUlum4Gh8iWW4XBrQx DSHrNfq3&index=7. After much debate and a few amendments, the New Hampshire legislature voted HB 1021 into law, and it was subsequently signed by Governor Sununu in July 2022. The very concerns that HB 1021 was introduced to combat, including local municipalities taking issue with religious assembly on personal property and forcing home churches to fight costly legal battles, are exactly the issues the Church faces here. This all solidifies the reality that the plain and unambiguous meaning of RSA 674:76 prohibits the very conduct the Town engages in now.

It is true that RSA 674:76 allows some forms of permissible regulation to structures primarily used for religious purposes, including those "concerning the height of structures, yard sizes, lot area, setbacks, open spaces, and building coverage requirements." RSA 674:76. Those limited and defined categories of permissible regulation, however, do not concern the type of regulation the Town seeks to implement here. Indeed, the barn is a 200-year-old structure that cannot have issues with the categories above; issues the Town has never raised or disputed. Rather, it is undisputed that the Town believes that the Church is subject to the full scope of the Regulations, which includes the submission of a site plan. RSA 674:76 could not be clearer that the Town's conduct is strictly prohibited. For the avoidance of doubt, the Church does not contend that this statute restricts the Town, or any other applicable state authority, from enforcing things not contemplated by RSA 674:76, such as fire, health, or building codes. But those codes are not the subject of this dispute and are distinct from the Regulations. *Compare* N.H. Rev. Stat., Title 64 – Planning and Zoning (§§ 672:1−679:19), *with* N.H. Rev. Stat., Title 12 – Public Safety and Welfare (§§ 153:1−173-C:10).

12

While RSA 674:76 has other restrictions on the Town's ability to impose other forms of permissible regulations, such as them being "objective and definite" and "do not substantially burden religious exercise," the Court need not address those considerations because the Town is not seeking to apply any of those limited and defined categories of permissible regulation. But if the Court were to address whether the Regulations are "objective and definite" and "do not substantially burden religious exercise," the answer for each would be in the negative. As described in detail below, these Regulations are anything but "objective." For instance, the Planning Board's chairman, Mr. Francisco, agreed that the Planning Board "exercises a lot of discretion in determining when a site plan is required" and that discretion is "based upon individualized assessments." Ex. 16, Craig Francisco Dep. at 25:2−9. And allowing the Town to enforce these Regulations as it sees fit would substantially burden the Church's religious exercise.

And even though the Town pretends that this statute does not exist, other towns and municipal associations in New Hampshire recognize RSA 674:76's clear mandate and have proceeded accordingly. For example, the Town of Stratham, New Hampshire, unanimously amended its zoning ordinance to make changes "necessitated by the State Legislature's passage of RSA 674:76 which limits the ability of municipalities to regulate land or structured used primarily for religious purposes." Ex. 17, Town of Stratham, Zoning Amendments with Corrections. Therefore, the zoning ordinance now indicates that "Places of Worship/Religious Uses do not require site plan review approval." Ex. 18, Town of Stratham, Zoning Ordinance § 2.1.62 (amended March 2024). Further, the New Hampshire Municipal Association, a respected association that even the Town's corporate representative is part of, issued guidance on RSA 674:76 in the months following its passage. *See* Ex. 3, 30(b)(6) Dep. at 78:21−23. This guidance told towns that RSA 674:76 "would override any municipal limitations . . . for land or structures

used primarily for religious purposes."  Ex. 19, N.H. Municipal Ass'n, Changes to Planning & Zoning Laws in 2022: A Guide for Municipalities (July 2022); *see* Ex. 23, N.H. Municipal Ass'n (Oct. 14, 2023) ("regulation is dramatically constrained").  It also indicated that, while there are a few limited and defined areas of permissible regulations, "other site plan review requirements, such as lighting, signs, noise, on-site and off-site drainage, . . . landscaping, and parking/access management requirements, *etc.*, would <u>not</u> be applicable to qualifying religious properties."  Ex. 19.  The association therefore recommended that those "claiming the protection of RSA 674:76 be required to provide an affidavit like the one attached."  *Id.*  In fact, other towns in New Hampshire have heeded the association's advice and adopted such an affidavit.  *See, e.g.*, Ex. 20, Affidavit of Religious Use of Land or Structures RSA 674:76 (adopted by Fremont, New Hampshire).

To date, the Town's sole argument against RSA 674:76's applicability is that it has not yet been interpreted by a court.  While such an argument has no bearing on the unambiguous text and statutory history, a quick look to other states in the First Circuit dealing with similar statutes confirms the Church's position.  For instance, Massachusetts has a law, known as the Dover Amendment, that broadly restricts municipalities from regulating the use of land or structures for religious purposes.  Mass. Gen. Laws Ann. ch. 40A, § 3.  Based on this law, multiple Massachusetts cases have held that attempts by local governments to require a site plan violated the Dover Amendment.  *See, e.g.*, *Bible Speaks v. Bd. of Appeals of Lenox*, 391 N.E.2d 279 (Mass. App. Ct. 1979) (declaring a by-law that required site plan review invalid);  *Bay Farm Montessori Acad., Inc. v. Town of Duxbury*, 912 N.E.2d 1040 (Mass. App. Ct. 2009) (same); *see also Petrucci v. Bd. of Appeals of Westwood*, 702 N.E.2d 47 (Mass. App. Ct. 1998) (affording Dover Amendment protection to a barn).  This also supports the Church's plain reading of RSA 674:76.

At bottom, there is no dispute that RSA 674:76's requirements and the Town's

Regulations' requirements conflict.  The Town's Regulations contemplate for these very moments, indicating that where there is any conflict with state law, the more stringent provision shall apply.  *See* Ex. 3, 30(b)(6) Dep. at 35:17−18 ("If there's a state law, that the stricter of the two apply.").  Clearly, RSA 674:76's prohibition is more restrictive, even the Town's corporate representative admits that.  *See id.* at 89:2−4 ("I'm not a lawyer, but I would think [RSA 674:76] would be more restrictive.").  Accordingly, the Town violates RSA 674:76's directive and the matter ends there.

## II.    The Town's application of its Regulations violates the First Amendment's Free Exercise Clause.

When a government entity burdens a plaintiff's sincere religious practice "pursuant to a policy that is not 'neutral' or 'generally applicable,'" the First Amendment has been violated "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (citations omitted).  The Town's application of its Regulations to the Church is not a neutral and generally applicable practice, triggering strict scrutiny—"a demanding and rarely satisfied standard."  *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (Mem.).  The Town's actions cannot survive strict scrutiny.

First, the Town has burdened the Church's religious practice.  No one disputes that the Church engages in sincerely motivated religious practice when it gathers for worship.  *See* Kaloogian Aff. ¶ 13.  The Town's conduct also cognizably burdens that practice.  From the outset of this dispute, the Town has stated and reaffirmed that the Church could not meet on Pastor Kaloogian's property without obtaining the Town's approval through its site plan regulations.  *See, e.g.*, Ex. 2, Sawyer Dep. at 105:12−18.  In other words, Sawyer, acting as the Town's Zoning Officer, told the Church to *stop* engaging in its religious practice.  Defendants' interference with the Church's religious practice only escalated thereafter, from the September 30, 2023, letter

stating that Pastor Kaloogian was required to apply for a Site Plan in order for the Church to continue to gather to the October 23, 2023, demand that Pastor Kaloogian "immediately stop any assembly regarding Grace New England Church"—under threat of escalating financial penalties. Two months later, the Town doubled down by demanding that the Church submit a site plan application under the threat of initiating legal action against the Church.  Dkt. 1, Compl., Ex. G.

The Town's conduct is a cognizable burden under the Free Exercise Clause.  Unlike the *substantial* burden test required by RLUIPA's text, the Free Exercise Clause analysis drops and requirement of substantiality and considers instead any *burden* on religious exercise to be sufficient when that burden is imposed pursuant to a law that is not neutral and generally applicable.  *See Kennedy*, 597 U.S. at 525 ("Under this Court's precedents, a plaintiff may carry the burden of proving a free exercise violation . . . by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"); *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) ("[T]he City has burdened the religious exercise of [the plaintiff] through policies that do not meet the requirement of being neutral and generally applicable."); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531–47 (1993) (noting that no party questioned the sincerity of petitioners' religious beliefs and addressing the free exercise violation without considering whether the burden was substantial); *see also see also Kravitz v. Purcell*, 87 F.4th 111, 124 (2d Cir. 2023) ("When we are considering government policies that are not neutral and generally applicable . . . there is no justification for requiring a plaintiff to make a threshold showing of substantial burden.").  As discussed below, the Church has proven the existence of the heightened substantial burden on its religious exercise required by RLUIPA.  But at a minimum, the Town's regulations and its application of those regulations to the Church burden its religious practice in a manner that is neither neutral nor

generally applicable.  For analysis under the First Amendment's Free Exercise Clause, that is sufficient to impose the application of strict scrutiny against the Town's regulations.

"Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny."  *Kennedy*, 597 U.S. at 526.  And "[a] government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'"  *Id.* (quoting *Fulton*, 593 U.S. at 533).

It is "straightforward to resolve this case under the rubric of general applicability."  *Fulton*, 593 U.S. at 533.  The Town's regulations are not generally applicable because "[t]he Planning Board may waive the requirements for *any* of the specific items outlined in the [Zoning Ordinance]" if the Board finds that "requiring all the information would be inconsistent with the intent of [the Ordinance], and the lack of such information will not impair of prejudice the Board's review."  Ex. 21, Town of Weare Zoning Ordinance § XV.  Because the Zoning Ordinance "permits the government to grant exemptions based on the circumstances underlying each application," it is not generally applicable.  *Fulton*, 593 U.S. at 534; *see also id.* at 537 ("The creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless whether any exceptions have been given … .").  Indeed, the Board can effectively grant an exemption without even relying on the "waiver" provision by simply deciding not to require a Site Plan Review for a particular site.  The Ordinance states that the Board observes "guidelines" to decide when it will act. Ex. 21, Ordinance § III.  Mr. Francisco agreed that the Planning Board "exercises a lot of discretion in determining when a site plan is required" and that discretion is "based upon individualized assessments."  Ex. 16, Francisco Dep. at 25:2−9.

17

Separately, the Town's *application* of its regulations is not neutral and generally applicable. A practice is not neutral and generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). The Town has treated other public events *in Pastor Kaloogian's barn* more favorably than the Church's services: it has never required a site plan review even for widely publicized events with large attendance, such as the Pine Tree Riot and a meet-and-greet for a political candidate. Ex. 1, Kaloogian Dep. at 45:15−23.

Because the Town has burdened the Church's religious practice based on a policy that is not neutral and generally applicable, "the focus shifts to the defendant to show that" its actions survive scrutiny. *Kennedy*, 597 U.S. at 524. "A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests. Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546).

The Town cannot satisfy this demanding test. It is not enough for the government to assert compelling interests "at a high level of generality"; instead, the government must identify not only "a compelling interest in enforcing its . . . policies generally," but also a compelling interest "in denying an exception" to the plaintiff. *Fulton*, 593 U.S. at 543. As discussed above, the Town does not have any rational interest, let alone a compelling interest, in violating New Hampshire state law. But that is exactly what the Town is doing by engaging in conduct explicitly forbidden by RSA 674:76. For this reason alone, the Town cannot satisfy strict scrutiny, but even if the Court considers the interests asserted by the Town, those interests fall short.

The Church does not dispute that in general, the Zoning Ordinance is related to valid governmental interests. *See, e.g.*, Dkt. 26-1, Defs.' Opp. to Mot. for Prelim. Injunction at 3 ("The

purpose of site plan review is to assess, among other factors, impacts from noise, adequate fire safety, vehicular impacts, and excessive burdens on public and private facilities.").  But no compelling interest supports forcing the Church to choose whether to abandon its worship services, continue those services in the face of threatened financial penalties, or cease to worship unless and until the Board deigns to give it permission to resume (perhaps under additionally burdensome conditions imposed by the Board).  Throughout the months in which the Town attempted to stop the Church from holding its worship services without first receiving the Board's blessing, the Town never once identified *any* particular reason why the Board would require the Church to undergo Site Plan Review (rather than exercising its discretion to find that the purported change in use did not necessitate a review, *see* Ex. 16, Francisco Dep. at 25:2−9), nor any reason to support the Board's refusal to waive the requirements (even after Pastor Kaloogian explained how the Town impermissibly interfered with his constitutional rights), *see* Ex. 21, Ordinance § XV.

The Town's willingness to permit comparable secular activities without requiring a Site Plan Review, *see* Ex. 22, Town of Weare Site Plan Review Regulations, or a formal waiver proves that the Town lacks a compelling interest in refusing to allow the Church an exception.  *See Lukumi*, 508 U.S. at 547 ("[A] law cannot be regarded as protecting an interest 'of the highest order' when it leaves appreciable damage to that supposedly vital interest unprohibited." ).  It is undisputed that the Kaloogians have used the same barn to host a variety of events, both private and public, including large recurring events.  Kaloogian Aff. ¶ 11; Ex. 1, Kaloogian Dep. at 32:4−7. The Town claims that its policy is to "not require land use permitting for singular instance and/or private events held in one's home." Dkt. 34, Answer ¶ 11.  But even if that's true, the Town cannot show any reason why the purported distinctions between "singular instance and/or private events"

and the Church's gatherings at Pastor Kaloogian's home, whether in the house or in the barn, are relevant to the interests served by the site plan review regulations.

Even assuming the Town's purported interests are compelling, it is not pursuing those interests by the least restrictive means. The Town could choose to exercise its discretion to treat the Church's use as a permissible accessory use. *See* Ex. 16, Francisco Dep. at. 29:1–16 (describing the discretion Town officials have at determining accessory uses). The Town could also simply grant the Church's previously denied waiver request. *See* Ex. 11, Aug. 21, 2024 Request. Further, the Town could follow the lead of multiple towns across New Hampshire that have passed their own ordinances implementing RSA 674:76 to exempt religious land use from their site plan regulations. "[I]t is hard to see how" the Town's law "can be regarded as 'narrowly tailored'" when it is "much tighter than those adopted by many other jurisdictions." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020); *Mast v. Fillmore Cnty.*, 141 S. Ct. 2430, 2433 (2021) (Gorsuch, J., concurring) (stating the government must offer a "compelling reason" why it cannot offer religious adherents alternatives available in other jurisdictions).

Finally, the Town could treat the Church the same way it treats other secular gatherings that do not require a site plan review. "Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too." *Tandon*, 593 U.S. at 63. The Town permits a wide variety of secular activities to proceed with *no* review or approval from the Planning Board. No "danger" requires making the Church's worship services subject to the Board's approval. And to the extent the Town has outstanding concerns related to safety or parking, there are other laws to address such concerns independent from the site plan review process. *See, e.g.*, N.H. Rev. Stat.,

Title 12 (§§ 153:1−173-C:10).  The First Amendment therefore requires the Town to leave the Church be, just as the Town allows people to gather in Pastor Kaloogian's home and in homes throughout Weare for weddings, political rallies, and annual commemorations without first receiving the Town's permission.  *See* Ex. 1, Kaloogian Dep. at 32:4–45:23.

### III.   The Town's application of its Regulations violates RLUIPA's Substantial Burden and Equal Terms provisions.

The Town's enforcement of its Regulations also violates RLUIPA, 42 U.S.C. §§ 2000cc *et seq.* RLUIPA prohibits the Town from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless that regulation is the "least restrictive means" of furthering a "compelling governmental interest."  *Id.* § 2000cc(a)(1).  It also prohibits the Town from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."  *Id.* § 2000cc(b)(1).  The Town has violated both provisions.

The threshold elements are obviously met. The Regulations are land use regulations within the scope of RLUIPA.  *See id.* § 2000cc-5(5) (defining a land use regulation to include "a zoning or landmarking law, or the application of such a law").  The challenged conduct affects the religious exercise of both Pastor Kaloogian and Grace New England Church, a religious assembly.

### A.    Substantial Burden provision.

The Town has violated the substantial-burden provision of RLUIPA.  When determining whether a land use regulation substantially burdens the plaintiff's religious exercise, the First Circuit "use[s] a functional approach to the facts of a particular case [and] recognize[s] different types of burdens and that such burdens may cumulate to become substantial." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 94 (1st Cir. 2013).  A regulation may impose a

substantial burden if it was "imposed on the religious institution arbitrarily, capriciously, or unlawfully." *Id.* at 97.  A municipality has acted arbitrarily and capriciously when it "base[s] [its] decisions on misunderstandings of legal principles" or acts in a manner "unlawful under state or local law." *St. Paul's Found. v. Ives*, 29 F.4th 32, 40 (1st Cir. 2022) (cleaned up).

The Town's application of its Regulations has been arbitrary, capricious, and unlawful. As explained in Section I above, the Town's attempt to impose its site plan review regulation on the Church plainly violates RSA 674:76.  Because the Town's position is based on "misunderstandings of legal principles" and is "unlawful," the Town's application of its Regulations to the Church constitutes a substantial burden.  *St. Paul's Found.*, 29 F.4th at 40.

The Town's demand that Pastor Kaloogian jump through its hoops of requesting a site plan review and asking the Board's permission to continue his religious exercise is also a substantial burden.  The Town asserted that it would subject the Church to scrutiny regarding issues such as "parking, hours of operation, [and] lighting."  Dkt. 1, Compl. Ex. G.  Craig Francisco, the chairman of the Town's Planning Board, affirmed that a site plan review would at a minimum entail a detailed inquiry into the Church's hours of operation, the number of congregants attending, where they would park, how the Church's activities would affect Pastor Kaloogian's septic tank.  *See* Ex. 16, Francisco Dep. at 42:5–44:3, 81:5–82:20.  Indeed, Mr. Francisco explained that a site plan review requires review by multiple government departments, including the "fire [department], highway conservation commission, historic commission," the Town's building inspector, and its police department.  *Id.* at 105:18–106:21.  In other words, the Town announced its intention to intrude on and micromanage the details of how the Church may operate within Pastor Kaloogian's home.  These are not minor issues.  The Town is claiming that the Church must submit to its authority regarding everything from when services are hosted to how the worship space is

appointed. Will the Church not be permitted to host a sunrise or twilight service? Will the Town require the Church to install a costly new septic tank? *Cf. Mast*, 141 S. Ct. at 2430 (granting, remanding, and vacating a case involving a country's efforts to force an Amish community to install a septic tank). Would the Town approve a candlelit service? That assertion of authority necessarily includes the power to require the Church to provide a wide range of detailed information about these topics and more before the Town will even consider granting permission for the Church to exercise its constitutional rights. What is more, Francisco asserts that a property owner filing *anything* with the Town gives the Town the right to enter the property to examine it. Ex. 16, Francisco Dep. at 71:6–73:2. In other words, the Town's insistence that Pastor Kaloogian submit its forms also amounts to a demand that he give up privacy rights in his home.

The Town's conduct does not survive strict scrutiny, as set out in Section II. The Town has not identified any particular interest served by its application of its Regulations to the Church, much less an interest "of the highest order," *Lukumi*, 508 U.S. at 546. And even if it had, its conduct is certainly not narrowly tailored to accomplish such a compelling interest as is required by RLUIPA. *See* 42 U.S.C. § 2000cc(a)(1)(B). The narrow-tailoring standard is "exceptionally demanding" and requires the government to "show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015). As discussed above, there are multiple less restrictive ways for the Town to achieve its interest, including simply treating the Church's gatherings in the same way that it treats secular gatherings—including those at Pastor Kaloogian's home—by not requiring a site plan. And if the Town had a compelling interest specific to the Church, then it could have worked with Pastor Kaloogian and the Church to address that specific concern. Instead, it chose time and again to insist that the Church begin the site plan review process—and whatever

Board restrictions were imposed as part of that process—or cease its worship services, despite having discretion to decide whether to require a site plan review at all and to decide whether to waive any parts of the Regulations.  That is far from "the least restrictive means of furthering" whatever the Town's interest may be.  *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1070 (9th Cir. 2011).

### B.    Equal Terms provision.

The Town has also violated RLUIPA's equal-terms provision, 42 U.S.C. § 2000cc(b)(1), by treating the church differently from its secular comparators.  *See Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 109 (1st Cir. 2020).  For years, the Town allowed the Kaloogians to use their property, including the barn, to host widely publicized events—both private and public.  *See* Ex. 1, Kaloogian Dep. at 32:4–45:23.  Those events have ranged from weddings to annual commemorations with over a *hundred* attendees.  *Id.* at 37:6−38:14, 41:8−42:21.  The Town has never claimed to require a site plan review for any of those events.  Nor has it required site plan reviews for other residents' secular assemblies, from Super Bowl parties to book clubs.  *See* Ex. 3, 30(b)(6) Dep. at 130:13−19 ("We don't – we don't regulate that.").

A secular gathering is a valid comparator if it and the religious gathering are "similarly situated with respect to the purpose of the underlying regulation."  *Signs for Jesus*, 977 F.3d at 109.  The stated purposes of the Regulations include guarding conditions related to health and safety, protecting public welfare, and controlling vehicle and pedestrian traffic.  *See* Dkt. 1, Compl. Ex. H.  Those interests are clearly implicated by the secular assemblies listed above to the same degree or more than by the Church's worship services and Bible studies.  There is therefore no question that "[b]y applying different standards for religious gatherings and nonreligious gatherings having the same impact, [the Town's enforcement action] impermissibly targets religious assemblies."  *Konikov v. Orange Cnty.*, 410 F.3d 1317, 1329 (11th Cir. 2005).  In

24

*Konikov*, the city attempted to shut down prayers in a rabbi's home while allow social or family gatherings like a cub scout meeting, game night, or birthday party. *Id.* at 1327–29. The Eleventh Circuit held that the city's application of its zoning policy to the rabbi violated RLUIPA's equal-terms provision. The same is true here. The Town has attempted to shut down prayers and worship services on Pastor Kaloogian's property while allowing other secular gatherings elsewhere.

## IV.    The Town's application of its Regulations violates the New Hampshire Constitution.

The New Hampshire Constitution recognizes that "[e]very individual has a natural and unalienable right to worship God according to the dictates of his own conscience, and reason; and no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession, sentiments, or persuasion; provided he doth not disturb the public peace or disturb others in their religious worship." N.H. Const. pt. 1, Art. 5. The Supreme Court of New Hampshire has indicated that New Hampshire's Constitution is more protective than the federal Free Exercise Clause. *See State v. Mack*, 249 A.3d 423, 442–43 (N.H. 2020). As a result, the Town's conduct violates the New Hampshire Constitution for the same reasons that it violates the federal Constitution. *See supra* Section II. Even if it did not rise to the level of a violation of the federal Constitution, it still would violate the New Hampshire Constitution. As the Supreme Court of New Hampshire emphasized, the state constitution "obliges the accommodation of religious practices that do not 'disturb the public peace.'" *Mack*, 249 A.3d at 440 (quoting N.H. Const. pt, I, Art. 5). For the reasons explained already, the Church's gatherings cannot be understood to disturb the public peace. Therefore, the Town is required to accommodate—not regulate—them.

### CONCLUSION

For the foregoing reasons, the Court should grant this Motion in its entirety, enter judgment in the Church's favor, and grant such other and further relief as it deems just and proper.

Dated:  March 28, 2025

<table>
<tr><td>

David J. Hacker (pro hac vice)
Jeremiah G. Dys (pro hac vice)
Ryan Gardner (pro hac vice)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway
Suite 1600
Plano, TX 75075
Tel: (972) 941-4444

</td><td>

Respectfully Submitted,

  _/s/ Connor R. Brewer_____

Phillip E. Marbury (Bar # 267645)
THE LAW OFFICES OF MARBURY & MARBURY,
PLLC
P.O. Box 2122
Wolfeboro, NH 03894
Tel.: (603) 569-4111
Fax: (603) 941-3180
_pm@marblaw.com_

M. Sean Royall (pro hac vice)
E. Caroline Freeman (pro hac vice)
KING & SPALDING LLP
1700 Pennsylvania Ave. NW, Suite 900
Washington, D.C. 20006
Tel.: (202) 737-0500
_sroyall@kslaw.com_
_cfreeman@kslaw.com_

Connor R. Brewer (pro hac vice)
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
Tel.: (214) 764-4420
_cbrewer@kslaw.com_

_Attorneys for Plaintiffs_

</td></tr>
</table>

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document using CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

_/s/  Connor R. Brewer_____