## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

```
*******************************************
Grace New England, et al.,              *
                                        *
            Plaintiffs,                 *
v.                                      *        Docket No. 1:24-cv-00041-PB-AJ
                                        *
Weare, NH, Town of, et al.,             *
                                        *
            Defendants.                 *
*******************************************
```

### DEFENDANTS' REPLY MEMORANDUM
### IN RESPONSE TO PLAINTIFFS' OBJECTION TO DEFENDANTS' MOTION FOR
### SUMMARY JUDGMENT

Defendants, the Town of Weare, New Hampshire, Craig Francisco, and Tony Sawyer[1], by

and through counsel, Gallagher, Callahan & Gartrell, P.C., hereby submit this Reply

Memorandum in Response to Plaintiffs' Objection to Defendants' Motion for Summary

Judgment, and state as follows:

### INTRODUCTION

The prolix nature of the pleadings in this case and the sizeable appendices may create an

impression that there is complexity to this case, or that there has been a great deal of interaction

between the Church and Defendants.[2] The breadth of legal arguments belies how truly simple

---

[1] Plaintiffs maintain that individual capacity claims are proper against Defendants Francisco and Sawyer, yet have not cited to the evidentiary record to demonstrate any action outside of their official capacities. Instead, Plaintiffs have relied on their own allegations from their Complaint, which show a fundamental lack of understanding about the role and duties of Planning Board Chair and Zoning Enforcement Officer. A Planning Board Chair, like Defendant Francisco, does not unilaterally render land use decisions, the Planning Board votes and makes decisions as a governmental body. A Zoning Enforcement Officer, like Defendant Sawyer, does not have authority to grant permits, variances, or exceptions, and serves only as a liaison to report zoning violations to the Town and/or inform property owners as to zoning compliance. Defendants have moved for summary judgment on the basis that the evidentiary record does not support claims against Defendants Sawyer or Francisco, but have not waived any argument as to qualified immunity or other defenses.
[2] Howard Kaloogian and Grace New England are interchangeably and collectively referred to as "Church" or "Plaintiffs" herein.

this case is, and how limited and routine the interactions have been between the Church and Defendants. Defendants take the opportunity in this Reply Memorandum to step back and reorient the Court to how straightforward the issues in this case are. At the core of this case, the Town requested site plan review when the subject property changed use from a single-family residence to a place of assembly hosting over 200 public gatherings a year; the Plaintiffs have consistently and completely refused to participate in any degree of local land use review; and the Plaintiffs have brought their grievances directly to the Federal Court seeking to turn a routine local land use matter into a case of Constitutional magnitude.

**(I)**    **The importance and purpose of site plan review to all New Hampshire municipalities.**

In New Hampshire, zoning ordinances, administered through a zoning board of appeals, and site plan review regulations, administered through a planning board, are a necessary government function to ensure that land use and development within a municipality is orderly and safe. RSA 672:1. Zoning ordinances and the zoning board of adjustment are typically concerned with how a particular property can be used (permitted uses), as well as objective design standards for how the property is physically developed. Site plan review regulations and the planning board are typically concerned with reviewing the finer details of a development plan, to ensure that it meets the objective design standards from a zoning ordinance, as well as standards that ensure safety to individuals, the community, and the environment.

When there is new development (such as constructing a new building), expanded development (such as adding an outbuilding), or a change of use to existing development (such as converting a personal garage to a public autobody shop) a planning board will conduct site plan review to confirm that the new, expanded, or changed conditions on a property are compatible with regulations that protect public health and safety. Traditionally, site plan review is

concerned with matters such as adequate septic to protect groundwater; adequate drainage to prevent flooding; adequate parking, access, and signage to protect pedestrian and vehicular movements; and adequate life safety to ensure emergency vehicles can access a property and that there is sufficient fire safety, prevention, and control.[3] Site plan review typically happens before new, expanded, or changes to development occur, to identify potential areas of concern when they only exist on paper, and correct them before any dangerous condition is created in the field. When a property owner comes before a planning board for site plan review, it has already been determined that the use itself is permitted, it is now a matter of confirming that the design aspects associated with that use are compatible with regulations and provide adequate safety.

When a matter undergoes site plan review, there is an iterative process between the property owner and the municipality to determine what provisions of local ordinances are actually applied to a particular project. Only those pieces of information that are pertinent to a given property or project are reviewed. As with most governmental activities in New Hampshire, a planning board conducts its discussions, review, and decision making in public meeting, after properly noticing the public, and providing notice to abutters, who may have a greater degree of interest in projects that impact their own properties. RSA 91-A; RSA 676:4.

The process of site plan review is not intended to micromanage the day-to-day use of a property. Rather, it is a necessary function to ensure that development/use on one property is not negatively impacting development/use on other properties. It is also a necessary function to ensure that public-facing uses are sufficiently safe, and that development is measured, orderly, and consistent with a community's Master Plan.

---

[3] This should not be read as a definitive list of site plan review considerations that have been, or would be, imposed upon Plaintiffs. As discussed below, Plaintiffs have not engaged with the Planning Board to an extent by which it can be determined which considerations may be applicable to Plaintiffs' change of use.

**(II)**     **The importance of site plan review as it pertains to the Church.**

When the Town learned that the subject property changed use from a single-family residence to a place of recurrent public assembly, it triggered the usual concerns that site plan review should be conducted to ensure that the public are sufficiently safe, and the increased usage at the property does not impact the surrounding area. From day-one when the Town contacted the Church, the Church has refused to participate in any degree of site plan review. (Def.s' App. Ex. P.) When subsequently "seeking waivers" the Church made no attempt to provide particular details about how the property is now being used, or to discuss particular areas of information that are irrelevant to the Church and therefore could be waived from site plan review. Instead, the Church requested to be waived from <u>all</u> site plan review requirements. (Def.s' App. Ex. V.) This is, of course, the same as requesting to be excused from any degree of site plan review. Even when the Town offered for the Church to come in for a face-to-face discussion to determine whether any or all regulations could be waived, and for which the Town would not require abutter notification or filing fees, the Church refused to participate. (Def.s' App. Ex. W.) And when the Church then asked the Weare Zoning Board of Adjustment to force the Planning Board to waive the entire site plan review process, which the ZBA lacks jurisdiction to do, the Church failed to appear before the ZBA or provide any further correspondence or briefing to support its position that site plan review is inapplicable to its change of use. (Def.s' Sec. Supp. App. Ex. KK.)

Plaintiffs want to present an image that they have diligently and meaningfully worked with the Town, and dutifully pursued every local avenue but have been met with roadblocks, so their only remaining recourse is with this Court. (Pl.s' Obj. pp. 2-3.) This is a demonstrably inaccurate recitation of Plaintiffs' participation. The evidentiary record establishes that, from the

very first day the Town had a cordial conversation with the Church about site plan review, the Church has taken an explicit position that it is not subject to any single aspect of land use review and is unwilling to participate in any ordinary process or procedure, including the processes that are specifically intended to protect the life and safety of the Church's congregation.

Plaintiffs further want to paint a picture that the Town is intent on applying land use regulations as a means to stymie use as a church. The Weare Zoning Ordinance specifically authorizes churches in Plaintiffs' zoning district, meaning there is no question that Plaintiffs may use their property as a church. Plaintiffs' contention that the Town will not allow a church use shows a fundamental misunderstanding of the difference between planning and zoning. The Town has been clear that <u>it is not</u> the church use that is triggering site plan review, it is the change from a single-family residence to a place of recurrent public assembly that triggers the need to review certain design elements to ensure that individuals are safe and the surrounding area is not negatively impacted. Stated differently, the fact that people are gathering for a church is not the issue, it is the fact that members of the public are being invited to gather in larger numbers and on a recurrent basis, without prior review of traffic, fire, septic, and other basic safety concerns that is the issue.

Plaintiffs present their own self-serving reassurances (relying only on Mr. Kaloogian's Affidavit and Declaration and nothing further) that they have made renovations that make the property safer and more accessible. Plaintiffs presumably present this discussion to self-certify that all regulations are met, and that the Town need not review the property further. (Pl.s' Obj. p. 2.) Setting aside that this is not how municipal review is conducted, the evidentiary record highlights known safety issues with the property. For example, the condition of the heating system installed by Mr. Kaloogian gave enough concern that a professional gas fitter withdrew a

mechanical permit and separately notified the Town he did not want to be associated with the work (Def.s' App. Ex. Z, AA); and the Building Code Inspector was so concerned that there was only one visible means of egress in an assembly area, which was an inward swinging 32" door, that he notified the State Fire Marshal to "please help as I do not want anyone to get hurt or die on my watch." (Pl.s' Ex. 10); and the Town Administrator "prays that nothing happens" because people are parked along the road on dark evenings, where the road crests and curves, and its 35-40 mph where people may not be familiar or expecting to encounter vehicles (Def.s' App. Ex. C, N. Bolton Depo. at 50:25-51:11). Plaintiffs attempt to discredit the Town by alleging that there are only general and unfounded concerns about safety that are being weaponized against the Church. But the Town has been clear that there are specific safety concerns that arise with places of assembly, and even more particularized concerns about Plaintiffs' place of assembly.

Plaintiffs again try to distance themselves from these safety concerns – or the need for site plan review to address the safety concerns – by saying that harm to person or property has not yet happened, and if harm does someday arise, it can be addressed at that time or by some other governmental entity. Site plan review is a necessary component to proactively identify areas of concern and establish a baseline of safety. Towns do not wait for a barn fire to see if people can get out safely, then assess whether there is adequate water supply, means of egress, and safety signage. Towns do not wait for a pedestrian to get hit on a dark road, and then assess whether additional lighting or signage could have better warned motorists. And towns don't wait to see if a residential septic system fails due to a significant increase in non-residential usage, then address it through environmental remediation.

The Plaintiffs attempt to characterize the Town as seeking to review and approve religious exercise. To be unequivocal, the Town desired site plan review because of the change of

use to become a recurrent place of assembly, not because people were assembling for religious purposes. The Plaintiffs further attempt to characterize the Town as assessing fines for the Plaintiffs' participating in religious activities. Again, to be unequivocal, the Town brought forth the issue of daily fines as a result of Plaintiffs' refusing to participate in municipal review, not as a fine on religious expression.

(III)    **Plaintiffs are basing their alleged injuries on abstract fears, not concrete or even plausible injuries.**

Plaintiffs further want to create an impression that, if they participate in site plan review, it will require great expense, and be a time consuming and onerous exercise, and will allow Town officials to simply show up and enter the Kaloogians' home at any time.[4] Plaintiffs want to present this as an "all-or-nothing" interaction with the Town – either the Church is exempted entirely from any consideration of site plan review, or it will be subjected to every provision and consideration of site plan review, and will, hypothetically, receive a denial. There is nothing in the evidentiary record – from communications before litigation to positions taken during litigation – to support an inference that the Town intends to subject the Church to every provision and consideration in the Site Plan Review Regulations. Not only is this a catastrophic characterization of what could be required of Plaintiffs, it is simply not how site plan review works. The scope of site plan review (i.e. the issues that could be discussed or the information that should be provided) is tailored to the property and type of development that comes before the Planning Board.[5] As demonstrated by other churches that have participated in site plan

---

[4] What Plaintiffs are referring to, and what has been taken far out of context, is the Planning Board practice of conducting a site walk to orient the Planning Board to exterior portions of property, which is prescheduled with a property owner, typically lasts less than half an hour, is not conducted for all applications, and is statutorily authorized pursuant to RSA 674:1.

[5] In no way should this be misconstrued to suggest that the Planning Board draws a distinction between secular and religious use. By way of example, a property changing use from a home garage to an autobody, but not constructing any new buildings, may not need to submit a construction timetable because it would be inapplicable. That same autobody may need to submit information about increased traffic and signage due to it's newly public-facing nature,

review, waiver requests have been readily approved for information that is irrelevant; applicants have not had to submit costly studies or documentation; there has been no discussion about day-to-day affairs of those churches or their religious practices; and they have been able to obtain approvals, sometimes in only a single meeting. (Def.s' App. Ex. Y.) There is nothing in the evidentiary record or in past practice to suggest that Plaintiffs would be subjected to a more rigorous exercise before the Planning Board. In fact, the only distinction between Plaintiffs and these other churches, is that the other institutions worked with the Planning Board, understood they are part of a community and that requires land use review to ensure basic health and safety, and provided information and discussion to narrow the scope of review and demonstrate their development was sufficiently safe.

The hypothetical parade of horribles that Plaintiffs lay out is indicative of the problem that has plagued this case from the outset. Plaintiffs have not engaged in any aspect of site plan review; have not submitted any true waiver request tailored to specific information that would not be relevant to their change of use; and have not had any meaningful communication with the Planning Board, Zoning Board of Adjustment, or land use staff. These are the types of conversations that establish what the scope of site plan review could or would be. Plaintiffs are using the term "site plan review" as a monolith, and making an assumption that it will be a burdensome, time-consuming, expensive, unchanging, and fruitless. This plainly ignores that site plan review is a spectrum – that can range from a single conversation that alleviates any Planning Board concern, to a more detailed review for projects with greater community impacts. But until such time that Plaintiffs actually engage with the Planning Board, the Town has not committed to a position on what the scope of site plan review could be, what provisions of the Site Plan

---

but may not need to provide information about septic systems or well location because those aren't implicated by the change of use.

Review Regulations could be at issue, and how those regulations could apply to Plaintiffs' property.

To put it bluntly, Plaintiffs are asking this Court to render a decision in their favor, based on the assumption they will have to go through full site plan review, and assuming they will have to provide costly documentation as to every consideration in the Site Plan Review Regulations, and assuming they will receive a denial. Assumptions are not enough to establish Plaintiffs' injury – one could just as easily assume that Plaintiffs engage in a single conversation with the Planning Board that negates the need for site plan review and/or results in an approval.

**(IV)    Plaintiffs have not identified a sincerely held religious belief that is burdened by site plan review.**

Plaintiffs have presented a thorough survey of court cases that shape the body of law surrounding RLUIPA and the Free Exercise Clause. But in *those* cases, a religious party was presented with a dichotomy that is highly distinguishable from *this* case. The cases that Plaintiffs rely on present a scenario where a religious entity must choose to exercise their sincerely held religious belief, or choose to obey a law, but those choices are mutually exclusive.

For example, the Seventh-day Adventist in *Sherbert v. Verner*, who had to decide between: (1) observing her religion by not working on Saturday, but forfeit unemployment benefits, or (2) abandon the precepts of her religion, but be eligible for unemployment benefits. 374 U.S. 398 (1963). Or the Amish parents in *Wisconsin v. Yoder*, who faced a decision between: (1) observing their religious belief that children should be vocationally educated within their religious community, and face a daily monetary penalty, or (2) defy their religious beliefs by sending their children to public or private schools, but comply with compulsory education laws. 406 U.S. 205 (1972). Or the Roman Catholic foster care agency in *Fulton v. City of Philadelphia*, that had to decide between: (1) honoring their religious belief that marriage is a sacred bond that

9

can only exist between a man and a woman, but forfeit the government contract that places foster children through their agency, or (2) defy their religion by certifying and endorsing that same-sex couples are in valid marriages, but then be eligible for foster child placement. 593 U.S. 522 (2021). Or the practitioners of the Santeria faith in *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, who were placed in a position of: (1) exercising their religious ritual of animal sacrifice, and be in violation of an ordinance that prohibited animal sacrifice, or (2) abandoning a pillar of their religious beliefs in order to comply with the prohibition against animal sacrifice. 508 U.S. 520 (1993). In these cases, there was a direct link between the government regulation and the impact it would have on a sincerely held religious belief. Put differently, those cases presented situations where an individual must put an actual religious tenet on the line in order to comply with a government directive.

No such situation exists in this matter. Plaintiffs have offered no suggestion of how the act of participating in site plan review impacts any belief, practice, or ritual of their faith. Using the framework that is presented in the cases above, Plaintiffs have been unable to articulate that, if they participate in site plan review, they will be prohibited or burdened from performing X-aspect of their sincerely held beliefs. Or, in the inverse, that exercising X-aspect of their sincerely held beliefs prohibits them from participating in site plan review. What Plaintiffs complain of is not a burden on their religious exercise as a result of a government regulation, they are complaining about the incidental effect on their religion as a result of their unwillingness to participate in a necessary function of organized society. Both site plan review and Plaintiffs' religious practices can coexist without issue.

Respectfully submitted,

**TOWN OF WEARE, NEW HAMPSHIRE**
**CRAIG FRANCISCO**
**TONY SAWYER**

By Their Attorneys,

**Gallagher, Callahan & Gartrell, P.C.**

Dated: May 5, 2025                    */s/ Emily C. Goering*
                                       Emily C. Goering, NH Bar No. 268497
                                       Robert J. Dietel NH Bar No. 19540
                                       214 North Main Street
                                       Concord, NH  03301
                                       603-545-3613 / 603-545-3613
                                       Goering@gcglaw.com
                                       Dietel@gcglaw.com


## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was transmitted this date via electronic mail to all counsel of record.


Dated: May 5, 2025                    */s/ Emily C. Goering*
                                       Emily C. Goering