UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Grace New England, et al.

v.

Town of Weare, et al.

Case No. 1:24-cv-41-PB-AJ
Opinion No. 2025 DNH 132

MEMORANDUM AND ORDER

Howard Kaloogian lives on a residentially zoned property in the Town of Weare, a small community in central New Hampshire. In 2023, Kaloogian founded Grace New England, a fledgling Christian church affiliated with Grace International Church and Ministries. Since founding Grace New England, Kaloogian has held church services in a converted barn on his property. Although churches are permitted in the residential zone in Weare, the Town's Site Plan Review Regulations require landowners to seek approval from the Planning Board whenever they propose a change in use of their property. This lawsuit stems from Kaloogian's claim that he cannot be made to comply with the Town's Site Plan Review Regulations.

Kaloogian and Grace New England bring five claims against the Town, its zoning enforcement officer, and its Planning Board chairman: one under the First Amendment's Free Exercise Clause (Count I); two under the Substantial Burden and Equal Terms provisions of the Religious Land Use

and Institutionalized Persons Act ("RLUIPA") (Counts II and III,
respectively); one under N.H. Rev. Stat. ("RSA") § 674:76 (Count IV); and one
under Part 1, Article 5 of the New Hampshire Constitution (Count V).[1]
Kaloogian seeks declaratory relief, an injunction preventing the Town from
applying the Site Plan Review Regulations against him, and nominal
damages.

The parties have filed cross-motions for summary judgment. For
reasons that I spell out below, I conclude that Kaloogian's claims are ripe
only to the extent that he asserts that he cannot be compelled to seek a
waiver from the Site Plan Review Regulations through a formal public
process in order to hold religious services on his property. As to these claims,
I conclude that Kaloogian's arguments fail on their merits. Claims based on
speculation about what specific requirements the Town may impose on
Kaloogian during the site plan review process must ripen before they can be
pursued.

---

[1]    For clarity's sake, I collectively refer to the plaintiffs as "Kaloogian"
and the defendants as "the Town" throughout.

I. BACKGROUND[2]

A.    Grace New England Church

Kaloogian has lived at 217 Colby Road in Weare with his wife, Martha, since 2015. Doc. 37-3 at 86. Their five-acre property is zoned for residential use and features two historic structures, both of which are over 200 years old: a house in which the couple resides, and an adjacent timber-framed, New England-style barn. Id. at 86-87; Doc. 37-2 at 11-12. Before the Kaloogians acquired the barn, prior owners reportedly used it as a woodshop and as a venue for social functions, complete with a dance floor and bandstand. Doc. 24-2 at 1-2.

In 2018, Kaloogian and his wife developed plans to convert their barn into a commercial event venue. See Doc. 40-1 at 3. Twice around that time, "in order to determine if the Town required anything else from [them] in order to be in compliance with the Town's ordinances," the couple went before the Town's Planning Board to present their plans. Doc. 24-2 at 2; Doc. 37-2 at 17. To do so, they attended a "Conceptual Consultation" with the Board (a type of municipal review in Weare explained in greater depth below). Doc. 40-2 at 3. There, the Kaloogians sought the Planning Board's approval to use

---

[2]    Although the parties characterize the facts differently, they do not dispute the facts material to resolving this case. See Doc. 40-1 at 2; Doc. 41-1 at 8-9.

their barn to host weddings, functions for adults with disabilities, and political events, among other activities. Doc. 37-2 at 17. They did not, however, envision locating a church there. Id. Concluding that a commercial event venue was not a permitted use in the Town's residential zone, the Planning Board instructed the Kaloogians to obtain a variance from the Town's Zoning Board of Adjustments and then return to the Planning Board. Doc. 40-2 at 3; see Doc. 40-1 at 3. The couple did not pursue the commercial enterprise further, but according to Kaloogian, the Planning Board nonetheless informed them that "as long as [they] did not charge for the events, the barn could be used for any lawful purpose, including dances and weddings." Doc. 24-2 at 2.

In the years that followed, the Kaloogians hosted a variety of community events on their property, ranging from the historical and political to the nuptial and social. For example, each April, they have partnered with Americans for Prosperity to host an annual speaking program that commemorates the 1772 Pine Tree Riot, typically drawing around 150 attendees.[3] Doc. 37-2 at 15. Their property has similarly played host to political speakers, including an outdoor visit from then-presidential

---

[3]    Unlike the other large events referenced, the Kaloogians began hosting commemorations of the Pine Tree Riot before their Conceptual Consultation with the Planning Board. See Doc. 37-2 at 15.

candidate Robert F. Kennedy, Jr. in 2023, which drew around 300 people. Id.
at 14. They also lent their property for an outdoor wedding attended by more
than 100 people in 2019, in which the barn served as a food-staging area for
catering staff. Id. at 16. And, like many a homeowner, the Kaloogians have
hosted a variety of smaller social gatherings at their home, including
"pinochle games, backgammon tournaments, Super Bowl parties, and New
Year's Eve parties." Doc. 24-2 at 3.

Shortly after moving to Weare, Kaloogian also began to host small
religious gatherings inside his house. Id. at 3. These events included weekly
Bible studies in his house's family room, which usually drew around 20
attendees. Id. He also used his house as a setting in which to "counsel and
engage in fellowship," including by using its kitchen and dining room as
venues for Thanksgiving meals and communions. Id.

In the fall of 2022, Kaloogian decided to expand the religious activities
on his property by formally establishing a new church. Doc. 37-2 at 17. The
following spring, he became an ordained minister with Grace International
Church and Ministries, Inc., a non-profit international Christian
organization, and that summer, he obtained a charter certification from the
same to establish Grace New England in Weare. Id.; Doc. 37-3 at 73. He also
obtained an employer identification number from the Internal Revenue
Service and opened bank accounts in Grace New England's name. Doc 37-3 at

84; Doc. 37-2 at 19. In September 2023, Grace New England incorporated as a non-profit corporation in New Hampshire. Doc. 37-3 at 81.

Kaloogian began holding weekly worship services for Grace New England's congregation on Saturday nights in his barn in the summer of 2023. Doc. 37-2 at 19. He also continued to host Bible studies, now under the auspices of Grace New England, on Tuesday nights. Id. Attendance at the Saturday night worship services seasonally fluctuates between 30 and 40, while Bible studies draw 12 to 20. Id. at 19-20. The congregation's size swells further for certain holiday services; 39 people attended Grace New England's candlelit Christmas Eve service in 2023, for example, and 71 people attended its Easter service in 2024. Id.; Doc. 37-5 at 30. And the congregation also gathers for a variety of other functions that are social in nature, such as cookouts, "ladies nights," and monthly movie nights. Doc. 37-5 at 4-74.

To accommodate Grace New England's growing congregation, Kaloogian has renovated his property over time, including the interior of his barn. Gone are the bandstand and dance floor, which he has respectively replaced with a pulpit and fourteen pews seating up to 85 people. Doc. 24-2 at 2; Doc. 37-2 at 19. He also hired someone to clear ninety feet alongside Colby Road on either side of his driveway for congregant parking. Doc. 37-2 at 12. In October 2023, he installed a propane-powered radiant heater in the barn, paid for by Grace International, and over the last few years, he has gradually

insulated the structure's ceiling, floor, and lower-level walls. Id. at 21. And in the summer of 2024, with help, he installed a restroom in the barn. Id. at 22.

The Kaloogians promote Grace New England's activities through a variety of communication channels, including an email list, invitation handouts at other events they host, and advertisements in "Weare in the World," an email newsletter published by the Town's library. Id. at 24; Doc. 37-4 at 88. Online, much of the church's publicity efforts are managed by Grace Woodlands, a Texas-based affiliate of Grace International. Doc. 37-2 at 23-24. Grace Woodlands manages the church's website, Facebook page, and Instagram page. Id. Grace New England is also listed on a mobile application called the Church Center App, which essentially operates as a public church directory. Id.

## B.   Regulatory Background

New Hampshire law empowers municipalities to enact zoning ordinances to regulate land use within their boundaries. RSA § 674:16. Municipalities may do so by geographically parceling the land within their bounds into any number of "districts" that serve the statutory purposes of zoning as laid out in RSA § 674:17. Id. § 674:20. Within each district, a municipality has fairly expansive authority to impose uniform rules that "regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures, or land" therein. Id.

State law also authorizes municipal planning boards "to require preliminary review of site plans and to review and approve or disapprove of site plans for the development or change or expansion of use of tracts for nonresidential uses or for multi-family dwelling units." Id. § 674:43. To do so, planning boards must adopt "site plan review regulations," which define "the procedures which the [planning] board shall follow in reviewing site plans" and must, inter alia, "[i]nclude [a] provision for waiver of any portion of the regulations." Id. § 674:44.

By its terms, the Town's Zoning Ordinance serves to "promot[e] the public health, general growth, safety and general welfare." Doc. 1-3 at 9. To do so, the Zoning Ordinance sets out six "Zoning Districts" into which private and public land in Weare is categorized: Village, Residential, Rural Agricultural, Commercial, Industrial, Wetlands, and Residential Manufactured Housing. Id. These Zoning Districts are non-cumulative in nature, meaning that the Zoning Ordinance separately enumerates the permitted uses in each. See id. at 23-35. Section 17.2 of the Zoning Ordinance establishes the permitted uses in Weare's Residential District, which include single- and two-family dwellings, home-based businesses, conservation, and certain agricultural activities. Id. at 23. Relevant here, churches are the very first permitted use listed in Section 17.2. Id.

The Town's Site Plan Review Regulations, meanwhile, require the approval from Weare's Planning Board "whenever any development or change or expansion of use of a site governed by these regulations is proposed or whenever any changes are proposed which differ from an existing site plan as previously approved by the Planning Board." Doc. 1-8 at 6. The purposes of the Review Regulations are numerous; chief among them, however, is to "[p]rotect the public health, safety, welfare and prosperity." Id. at 5.

Section III of the Site Plan Review Regulations sets out "guidelines" for "what constitutes a change of use of sufficient magnitude or impact to trigger Planning Board action." Id. at 6. In relevant part, the guidelines suggest that the Planning Board should review "[a]ny change in use of a site or structure when such change is materially or substantially different from the previous use such that there is a significant effect on the quantitative or qualitative requirements of these Regulations or the Zoning Ordinance," as well as "[a]ny expansion of use of a site or structure where there is" such an effect. Id.

When there is "doubt" as to whether a given project necessitates the Planning Board's approval, Section III invites the "affected party" to "request a determination from the Board." Id. Relatedly, Section V of the Review Regulations provides for two "pre-application reviews" called "Conceptual

Consultations"[4] and "Design Reviews." Id. These reviews are characterized as

"optional" and available "to discuss project proposals with the Planning

Board in the early stages of consideration and design." Id. A Conceptual

Consultation, the only of these two reviews invoked in this case, is defined as:

> A discussion in conceptual form and general terms only.
> Discussion may include desirability of types of development and
> proposals under the master plan. No development plans can be
> used as part of the discussion. An existing survey, tax map, etc.
> may be referred to. The meeting must be scheduled on the Board's
> meeting agenda, but it is not necessary to make formal notice to
> abutters and other applicable individuals.

Id. While Conceptual Consultations must be scheduled on the Planning

Board's meeting agenda, they do not serve as applications for the Board's

formal approval. Id. at 6-7. Rather, the Board offers these preliminary

reviews "to save the applicant unnecessary expense and changes later in the

process." Id. at 7.

Significantly, Section XV of the Review Regulations permits the

Planning Board to "waive the requirements for any of the specific items

outlined in these Regulations," so long as the Board finds that "requiring all

the information would be inconsistent with the intent of these regulations,

---

[4]    The parties and their deponents interchangeably refer to the
"conceptual" process as a "review," "discussion," "consultation," or "meeting."
For consistency, I refer to it as a "Conceptual Consultation" in keeping with
the Site Plan Review Regulations' verbiage. See Doc. 1-8 at 6.

and the lack of such information will not impair or prejudice the Board's review." Id. at 22. In his deposition testimony, the Planning Board's chairman, Craig Francisco, explained that a Conceptual Consultation serves as the earliest procedural juncture at which the Planning Board has authority to issue a waiver from further review. Doc. 37-2 at 188.

Absent such a waiver, a change of use goes before the Planning Board through one of two processes: Site Plan Review or Change of Use Review. Doc. 1-8 at 6, 21-22. The former is the more comprehensive of the two; per Section X of the Site Plan Review Regulations, in applying for Site Plan Review, a property owner must submit a plat of the subject property depicting its layout and attributes in detail; provide notice to the property's abutters; and pay certain fees to the Town. See id. at 11-13, 26. The Board may also require the property owner to submit additional exhibits as warranted by the particular change of use, including professionally prepared studies, renderings, and design plans. Id. at 13-14.

Alternatively, "[i]n instances where a change of use does not require a site plan," the Planning Board may require under Section XIII of the Site Plan Review Regulations that a property owner submit to a Change of Use Review. Id. at 21-22. In determining whether to do so, the Board must consider whether a proposed use "reflect[s] the nature of the existing or future use," "differ[s] in character, nature and kind from the existing use,"

11

would "hav[e] a substantially different impact on the neighborhood," or
would, "in the opinion of the Board[,] require[] Planning Board approval in
order to ensure the health, welfare, morality (integrity, principles) and safety
of Weare's citizens and recreational guests." Id. If the Board concludes that a
property owner should undergo Change of Use Review, the property owner
must submit a proposal describing the subject property and planned changes
along with a "scaled plan of the property." Id. at 22. As compared to the
submissions required for Site Plan Review, this proposal may be less
detailed, with the caveat that the Board may still request "any further
information it deems necessary for proper review." See id. The property
owner must also pay an application fee. Id. at 26.

C.    The Parties' Interactions

Shortly after Kaloogian established Grace New England, Weare's Town
Administrator, Naomi Bolton, saw one of the advertisements in "Weare in the
World" for its weekly church services. Doc. 37-2 at 103; see also Doc. 37-4 at
88. Bolton asked Tony Sawyer, the Town's zoning enforcement officer, to visit
Kaloogian's property later that day. Doc. 37-2 at 118. There, during a
fifteen-minute visit, Kaloogian showed Sawyer around his property, including
the retrofitted barn. Doc. 37-3 at 20. Sawyer provided Kaloogian with a
"Planning Board Application For conceptual or design review" and informed
him that "to continue doing what [he was] doing," Kaloogian would "just have

to go to the planning board," a process Sawyer indicated that Kaloogian could initiate by submitting the application.[5] Id. at 20-21; see also Doc 37-4 at 15.

Rather than fill out and submit the application, Kaloogian drafted a letter to Francisco on Grace New England's letterhead. Doc. 1-2 at 2-3. In the letter, Kaloogian represented that Sawyer had told him that his "property is zoned residential and [he and his wife] are thus not allowed to hold church services on [their] property." Id. at 2. Kaloogian went on to assert that requiring him to complete the application contradicted the Town's Zoning Ordinance, given that it provides for churches as a permitted use in the Residential District, and amounted to a constitutional violation because "submit[ting] the form . . . would involve the government prohibiting [his] right to worship in [his] home." Id. Thus, Kaloogian told Francisco, he would refuse to comply with Sawyer's request. Id.

---

[5]    The "Planning Board Application For conceptual or design review" is a one-page form that, in addition to fields soliciting certain identifying information (e.g., address of property, contact information, acreage), asks four questions. Doc. 37-4 at 15. First, it asks the applicant to "[d]escribe in detail all existing uses & structures on the subject property." Id. Next, the form asks the applicant to "[d]escribe in detail all proposed uses, structures, construction or modifications." Id. The form then asks applicants to "[c]heck if proposal includes" a "[n]ew street," "[p]ublic/[c]ommunity [w]ater," or "[p]ublic/[c]ommunity [s]ewer." Id. Finally, the applicant must identify the date of "any Variance granted" or "any Special Exception granted." Id.

Francisco responded to Kaloogian's letter a week later. Doc. 1-4 at 2-3. In his letter, Francisco stated that, after meeting to discuss Kaloogian's letter and the "use of [his] property for religious and/or other gatherings," the Planning Board had "determined that [Kaloogian would] need to apply for a Site Plan to continue these gatherings." Id. Francisco cited the Zoning Ordinance's definition of "applicant," which encompasses any individual(s) "desiring to construct, assemble or erect any structure for residential, commercial, agricultural, religious, or other purpose anywhere within the Town of Weare." Id. at 2; accord Doc. 1-3 at 13. Francisco also referenced the Board's authority to conduct Site Plan Review under Section I of the Site Plan Review Regulations, see Doc 1-8 at 5, and Section II's enumeration of their purposes, see id. at 5-6. Doc. 1-4 at 2-3. Francisco concluded his letter by noting that "Section III goes on to explain that the Planning Board shall have the responsibility for making the final decision as to the necessity of Site Plan Review." Id. at 3; see also Doc. 1-8 at 6.

On October 23, 2023, the Town sent a cease-and-desist notice to Kaloogian, instructing him to "immediately stop any assembly regarding Grace New England Church . . . until a site plan is submitted, reviewed and there is a decision made by the Town Planning Board." Doc. 1-1 at 2. Citing Article 9 of the Zoning Ordinance, see Doc. 1-3 at 20, the cease-and-desist notice indicated that Kaloogian would owe a fine of $275 per day of

14

noncompliance starting thirty days thereafter. Doc. 1-1 at 2. Three days later, Kaloogian responded in writing through counsel, demanding that the Town "withdraw [its] 'Cease and Desist' letter immediately" and threatening suit if "the members and visitors" of Grace New England "be penalized or their civil rights be otherwise punished or burdened." Doc. 1-5 at 2-4. The next day, by way of an email from Sawyer, the Town "temporarily lifted" the cease-and-desist. Doc. 1-6 at 2.

The Town responded to Kaloogian again by email from its own counsel on December 10, 2023. Doc. 1-7 at 2-3. In her message, the Town's attorney asserted that, while "Churches are a permitted use in the [residential] district," "all non-residential uses in Weare require site plan approval, regardless of whether the use of the property is permitted by zoning or not." Id. at 3. Thus, she advised, "[t]he use of the barn to hold religious services requires site plan approval, just as any other non-residential use would require." Id. The Town's attorney went on to distinguish Grace New England's activities from other social gatherings in Kaloogian's home based on the former's open invitation to the public, noting that the resulting "issues such as parking, hours of operation, lighting, and the safety of those assembling in the barn are subject to review under both state and federal law." Id. She concluded her email by asking Kaloogian's counsel to "instruct [his] client to apply for site plan approval within the next 30 days, or the

town may choose to seek the assistance of the Hillsborough County Superior Court to require him to do so." Id. Kaloogian's counsel and the Town's attorney subsequently agreed to extend this deadline to February 10, 2024. Doc. 24-2 at 6.

D.    Procedural Background

On February 9, 2024, Kaloogian and Grace New England filed this lawsuit against the Town, as well as against Sawyer and Francisco in their individual and official capacities. Doc. 1. Kaloogian moved for a preliminary injunction on March 1, 2024. Doc. 24. While that motion was pending, the parties moved to stay the case for ninety days to explore an out-of-court resolution to their dispute, during which the Town agreed not to take any enforcement action related to religious gatherings at the Kaloogians' home. Doc. 31. I granted that motion.

While the litigation was stayed, Kaloogian submitted an unsigned and undated "short 'narrative' asking the Town . . . to waive all site plan/change of use review requirements pursuant to New Hampshire law." Doc. 37-4 at 36. In response, the Town notified Kaloogian in a letter that, "following the same path as all others," he would be scheduled for a Conceptual Consultation with the Planning Board on its October 24, 2024 meeting agenda to "discuss face to face the request." Id. at 38. Attached to that letter, the Town provided Kaloogian with another copy of the same application for a

Conceptual Consultation that Sawyer had provided during his site visit over a year before and asked him to "kindly return the conceptual form prior to the meeting." Id. at 38-39. Refusing to do so, Kaloogian instead submitted his waiver request to the Town's Zoning Board of Adjustments, which determined at its December 3, 2024 meeting that it lacked jurisdiction to consider the request. Doc. 37-4 at 41; Doc. 45-1 at 3. By all accounts, Kaloogian never attended the scheduled meeting with the Planning Board.

Failing to reach an accord, the parties proceeded with discovery following the stay's expiration. Doc. 33. At a status conference on November 25, 2024, with Kaloogian's agreement, I denied as moot without prejudice his motion for a preliminary injunction based on the Town's nonenforcement against him during the pendency of this litigation. See Doc. 26-1 at 8-9. The parties agreed that the case would be resolved on cross-motions for summary judgment, which are before me now.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227

(1st Cir. 1996)). A "genuine dispute" exists if a reasonable factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

Where the movant does not bear the burden of proof on the dispositive issue, it need only "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Where, however, "the movant bears the burden of proof at trial, he must demonstrate every element of his case such that 'no reasonable trier of fact could find other than for [him].'" Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir. 2015) (alteration in original) (quoting Lopez v. Corporación Azucarera de P.R., 938 F.2d 1510, 1516 (1st Cir. 1991)).

When the parties cross-move for summary judgment, the standard of review is applied to "each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)); see also Mandel v. Bos. Phx., Inc., 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."). Thus, I must "determine whether either of the parties deserves judgment as a

matter of law on facts that are not disputed." Adria Int'l Grp. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

## III.  ANALYSIS

The parties preliminarily dispute whether Kaloogian's claims are ripe for adjudication. I conclude that they are not, save for one narrow respect. I begin by explaining the analysis that leads me to that conclusion. I then examine how Kaloogian's claims fare as applied to the limited ripe controversy present here.

## A.  Ripeness

"The 'basic rationale' of the ripeness inquiry is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967)). Particularly relevant here, the "[r]ipeness doctrine seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" In re Fin. Oversight & Mgmt. Bd. for P.R., 9 F.4th 1, 8 (1st Cir. 2021) (quoting Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017)). This doctrine has evolved to have both jurisdictional and prudential underpinnings. Mangual v. Rotger-Sabat, 317 F.3d 45, 59 (1st Cir. 2003). On the jurisdictional side, requiring that a claim is ripe to adjudicate ensures that a court steers clear of

rendering an unconstitutional advisory opinion in contravention of Article III's "case or controversy" requirement. Roman Cath., 724 F.3d at 89. Prudentially, this requirement assures "'judicial restraint from unnecessary decision of constitutional issues'" where "delay may see the dissipation of the legal dispute without need for decision." Mangual, 317 F.3d at 59 (quoting The Regional Rail Reorganization Act Cases, 419 U.S. 102, 138 (1974)).

The ripeness inquiry requires a plaintiff to show that "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant" judicial review. Lab. Rels. Div. of Constr. Indus. of Mass., Inc. v. Healey, 844 F.3d 318, 326 (1st Cir. 2016) (quoting MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007)). To do so, the plaintiff must establish two elements: "fitness" and "hardship." Reddy, 845 F.3d at 501. The fitness prong, which dually serves jurisdictional and prudential functions, "concerns whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." Roman Cath., 724 F.3d at 89. "This branch of the test typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Ernst & Young v. Depositors Econ. Prot. Corp., 45 F.3d 530, 535 (1st Cir. 1995). Meanwhile, the "wholly prudential" hardship prong, Roman Cath., 724 F.3d at 89, "typically turns upon whether the

challenged action creates a direct and immediate dilemma for the parties,"
N.H. Lottery Comm'n v. Rosen, 986 F.3d 38, 53 (1st Cir. 2021) (quoting R.I.
Ass'n of Realtors, Inc. v. Whitehouse, 199 F.3d 26, 33 (1st Cir. 1999)). In
other words, the plaintiff must show that, "in light of all the attendant
circumstances," a favorable judgment would be "useful[]" in rendering
"weightless" "the burden of which [the plaintiff] complains." Ernst & Young,
45 F.3d at 540-41.

At oral argument, the Town conceded that Kaloogian's challenge is ripe
with respect to its demand that, at minimum, he must submit to a
Conceptual Consultation to seek a waiver from further municipal review. I
agree; this aspect of Kaloogian's challenge readily satisfies both prongs of the
ripeness inquiry. The Town has consistently held the position throughout its
interactions with Kaloogian and in this litigation that, for Grace New
England to continue to convene, Kaloogian must at least apply for a waiver
under Section XV of the Site Plan Review Regulations, see Doc. 1-8 at 22, and
that to do so he must, at minimum, apply for and participate in a Conceptual
Consultation. See, e.g., Doc. 37-3 at 20-21 (instructing Kaloogian to "go to the
planning board" after presenting him with an application for Conceptual
Consultation); Doc. 37-4 at 38 (refusing to consider Kaloogian's waiver
request until he participates in a Conceptual Consultation). And, for his part,
Kaloogian has steadfastly refused to engage in any review by the Planning

Board, including the limited steps needed to seek a waiver from the Town, on the asserted grounds that requiring him to engage in even that limited extent of formal process would be statutorily and constitutionally unlawful. See, e.g., Doc. 1-2 at 2-3 ("respectfully declin[ing] to submit the [application] form provided" by Sawyer); Doc. 37-1 at 11 (refusing to attend Conceptual Consultation scheduled for review of his waiver request).

Such an impasse leaves little room for doubt that the parties' immediate dispute at this juncture—whether the Town may require Kaloogian to request a waiver from further review through a formal process before the Planning Board, such as a Conceptual Consultation—is a live controversy. While the Town has varied across its correspondence with Kaloogian on whether the Board would likely grant the comprehensive waiver he seeks or instead require him to undergo further municipal review, its essential directive that Kaloogian take part in no less than a Conceptual Consultation is not "contingent upon events" yet to occur. Mass. Ass'n of Afro-Am. Police, Inc. v. Bos. Police Dep't, 973 F.2d 18, 20-21 (1st Cir. 1992) (per curiam). Nor is it "uncertain" that Kaloogian continues to violate that directive in refusing to do so, as Grace New England persists in gathering on

his property anyway.[6] Ernst & Young, 45 F.3d at 536. More factual development thus would not "significantly advance [my] ability" to determine whether requiring Kaloogian to participate in this preliminary process is lawful, id. (quoting Duke Power Co. v. Carolina Env't Study Grp., 438 U.S. 59, 82 (1978)), making the issue fit for review.

Likewise, Kaloogian would be prejudiced by a delay in review. Deprived of the opportunity at this juncture to assert his claimed right to completely avoid any form of enforcement by the Town, Kaloogian would be forced to engage in at least a Conceptual Consultation to secure a waiver from further review, a process he asserts is itself unlawful, or otherwise refrain from constitutionally-protected religious activities. Forcing a plaintiff to choose between complying with an assertedly unlawful process or abandoning his constitutional rights is precisely the kind of "dilemma" that a favorable

---

[6]    The fact that Grace New England has continued to convene in contravention of the Town's directives throughout the parties' dispute has limited bearing on this analysis. A government's failure to fulsomely enforce a regulation is only a "factor[]" in "the ripeness equation," which permits challenges to regulations devoid of any enforcement history. R.I. Ass'n of Realtors, 199 F.3d at 28, 33-34 (finding a challenge to a state statute ripe despite twenty-year history of nonenforcement). Here, I find that the Town's restraint from imposing fines as described in its cease-and-desist, see Doc. 1-1 at 2, and from seeking the intervention of a state court as threatened in its attorney's correspondence, see Doc. 1-7 at 2-3, is more readily ascribed to the threat and now pendency of this litigation than any independent unlikelihood that it would otherwise pursue these repercussions.

judgment would resolve. N.H. Lottery Comm'n, 986 F.3d at 53 (quoting R.I. Ass'n of Realtors, 199 F.3d at 33); cf. Reddy, 845 F.3d at 505 (finding "no apparent prejudice to the plaintiffs" where they were not yet "'required to engage in, or to refrain from, any conduct'" until a future event materialized). Thus, adjudication of this narrow question is prudentially appropriate.

The Town's waiver process aside, the parties disagree on whether Kaloogian's statutory and constitutional claims are ripe insofar as they challenge other aspects of the Town's municipal review processes. Kaloogian frames these challenges broadly, asserting that the "application of the Town's ordinances" writ large to Grace New England violates the Free Exercise Clause, RLUIPA, RSA § 674:76, and Part 1, Article 5 of the New Hampshire Constitution. Doc. 1 at 20-26. Kaloogian also asks me to enjoin the Town "from taking any further steps to enforce the Town's ordinances" against him. Id. at 26 (emphasis added). As is self-evident from his phrasing, Kaloogian's claims sweep well beyond the scope of the ripe issue addressed above. Rather, Kaloogian seemingly seeks to challenge the lawfulness of any conceivable enforcement action against him by the Town pursuant to any of its zoning regulations, including the entire Zoning Ordinance and the Site Plan Review Regulations that implement it.

To the extent that Kaloogian's claims sweep so far, I conclude that the facts underlying his claims are too uncertain at this stage for judicial

adjudication.[7] The only extent to which the Town has concretely "applied" its Zoning Ordinance or Site Plan Review Regulations to Kaloogian is by insisting that, because his property has undergone a qualifying change of use under Section III of the Site Plan Review Regulations, he must follow the ordinary sequence of municipal review for such changes of use, including the standard procedure by which a property owner may apply to avoid steps in that sequence.

Indeed, as previewed above, Section XV of the Site Plan Review Regulations expressly gives the Planning Board the authority to "waive the requirements for <u>any</u> of the specific items outlined" therein. Doc. 1-8 at 22 (emphasis added). According to Francisco's deposition testimony, the earliest stage of municipal review at which the Board can exercise this authority is a Conceptual Consultation. Doc. 37-2 at 188. And in practice, he noted, several property owners have successfully avoided any further review of their properties' changes of use by obtaining a waiver at that stage. Id. at 179, 188-90. This should come as no surprise, as the availability of such waivers is required by state law. See RSA § 674:44.

---

[7]    Because a plaintiff must establish both prongs of the ripeness inquiry for his claim to survive, I need not reach the test's hardship prong. See Ernst & Young, 45 F.3d at 535 ("[W]e hold that both prongs of the test ordinarily must be satisfied in order to establish ripeness.").

It follows that Kaloogian might well secure a waiver of all review of Grace New England's activities subsequent to a Conceptual Consultation after simply completing the steps involved in that initial review process.[8] As a result, to rule on the lawfulness of the Town's zoning enforcement vis-à-vis Kaloogian in any other respect, I would have to guess at how several contingent events would play out, including whether and the extent to which the Board would grant Kaloogian a waiver if he indeed applied for one through the typical process. He has not, however, and our ripeness doctrine does not permit me to fill in the gaps in his case with my own guesswork. See Roman Cath., 724 F.3d at 91 (finding the fitness prong unsatisfied where the municipality "had no opportunity to demonstrate whether or not it [would] accommodate some, all, or none of [the plaintiff church]'s requests"); cf. Pakdel v. City & County of San Francisco, 594 U.S. 474, 479 (2021) (noting, in takings context, that a dispute only becomes ripe "[o]nce the government is committed to a position").

---

[8]    Kaloogian and his wife availed themselves of precisely this process when they considered opening a commercial event venue in 2018. See Doc. 40-2 at 3. Especially in light of Sawyer's invitation to do the same with respect to Grace New England, Kaloogian's history of engaging with the Planning Board through Conceptual Consultations suggests that—notwithstanding the Town's firm description of its position in some of its communications—Kaloogian has known throughout his interactions with the Town that the "site plan review" it demanded has always encompassed the option for this procedural detour.

In summary, I conclude that Kaloogian's claims are ripe only to the extent they challenge the Town's requirement that the Planning Board consider his waiver request according to one of the formal processes provided for in the Site Plan Review Regulations, such as by applying for and participating in a Conceptual Consultation under Section V. See Doc. 1-8 at 6-7. Kaloogian's claims are not ripe, however, to the extent they challenge the Town's zoning enforcement beyond that initial procedural requirement. I therefore proceed to address only the merits of Kaloogian's ripe claims.[9]

B.     Kaloogian's Claims

Kaloogian contends that the Town's attempt to enforce its Zoning Ordinance and Site Plan Review Regulations violates his rights under four provisions of law: the Free Exercise Clause of the First Amendment; the Substantial Burden and Equal Terms provisions of RLUIPA; Part 1, Article 5 of the New Hampshire Constitution; and RSA § 674:76. As explained, while

---

[9]     The Town separately argues that I lack jurisdiction to review Kaloogian's claims because, in the Town's view, he was obligated to first exhaust his administrative remedies by appealing any adverse decisions by the Planning Board to the Zoning Board of Adjustments pursuant to RSA § 676:5 and any adverse decisions by the Zoning Board of Adjustments to the New Hampshire Superior Court pursuant to RSA § 677:4. Doc. 37-1 at 13-15. Given that I lack jurisdiction over his claims for other reasons, save for the one respect which the Town concedes, I need not reach this argument.

Kaloogian broadly formulates his claims, I assess them only to the extent that they apply to the Conceptual Consultation requirement.

    1.    <u>Free Exercise Clause</u>

In Count I, Kaloogian asserts that the Town's requirement that he seek a waiver from Site Plan Review violates his rights under the First Amendment's Free Exercise Clause. Doc 1 at 20-22. Because I conclude that the requirement at issue is neutral and generally applicable, and that any burden it imposes is rationally related to a legitimate government interest, this claim fails.

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including," as Kaloogian seeks to do here, "by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 525 (2022) (quoting Emp. Div., Dep't of Hum. Res. of Or. v. Smith, 494 U.S. 872, 880 (1990)). Should a plaintiff make that showing, the burden shifts to the government to establish that its action satisfies strict scrutiny. See id. at 526 ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny . . . ."). That is, the government must "demonstrat[e] its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." Id. at 525. However, if the plaintiff fails to meet his burden, then the challenge fails so long as the

neutral and generally applicable policy "is rationally related to a legitimate government interest." Does 1-6 v. Mills, 16 F.4th 20, 29 (1st Cir. 2021); see also Fulton v. City of Philadelphia, 593 U.S. 522, 533 (2021) (citing Smith, 494 U.S. 872 at 878-82) ("[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable.").

The First Circuit and Supreme Court treat neutrality and general applicability as analytically distinct elements. See Does 1-6, 16 F.4th at 29-30; Kennedy, 597 U.S. at 526. A legal requirement is not neutral under this approach "when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature" Fulton, 593 U.S. at 533. It is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" or "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." Id. at 533-34 (citation modified).

Considering only the requirement that Kaloogian must seek a waiver from the Site Plan Review Regulations through a formal process, I conclude that the Town's policy in this case is neutral as to religious activities. The Site Plan Review Regulations on their face require all property owners subject to them to seek a waiver from the Planning Board in order to be freed

29

from the Site Plan Review process. See Doc. 1-8 at 22. And Kaloogian offers

no evidence to suggest that the Town structured its review processes to

deliberately "single out" for Conceptual Consultations those property owners

engaged in or proposing religious uses of their properties. Does 1-6, 16 F.4th

at 29. Rather, Section V of the Site Plan Review Regulations emphasizes that

Conceptual Consultations are universally available to any prospective

applicant for review before the Board, regardless of stripe. See Doc. 1-8 at

6-7. The Conceptual Consultation procedure is therefore neutral.

 Likewise, the Town's policy is generally applicable. This conclusion

follows from the fact that Conceptual Consultations are universally necessary

for any property owner seeking to obtain a waiver from all of the other, more

cumbersome forms of review contemplated by the Site Plan Review

Regulations.[10] It is true that the waivers themselves may conceivably be

---

[10] Of course, as a Conceptual Consultation is "optional" by the terms of Section V of the Site Plan Review Regulations, a property owner may elect to skip it entirely and instead submit his waiver request at Design Review, Site Plan Review, or Change of Use Review. Doc. 1-8 at 6. However, a Conceptual Consultation is functionally "required" in situations like this one, in which a property owner seeks to minimize municipal review as much as possible, since such a property owner would nonsensically subject himself to the very burdens of later-stage review that he seeks to avoid altogether if he skipped the Conceptual Consultation and instead presented his waiver request at, say, Site Plan Review. Accordingly, a Conceptual Consultation imposes the minimum burden a property owner must bear when proposing a change of use.

expansive and are largely discretionary, as Section XV authorizes the Planning Board to waive "any" of Site Plan Review Regulations' requirements so long as the Board merely finds that doing so would not be "inconsistent with the[ir] intent" or "impair or prejudice the Board's review." Doc. 1-8 at 22. But it is equally true that, before the Board can ever engage in that assessment, any property owner must at minimum apply for and attend a Conceptual Consultation where the requested waiver is discussed. Doc. 37-2 at 188. Thus, while the issuance of waivers involves the Board's exercise of discretion, its policy governing how a property owner may submit a request for one—which, again, is the only ripe policy before me—does not. For this reason, Kaloogian's principal argument against general applicability, which hinges on the discretion that the Board retains in issuing waivers, has no bearing on the unwaivable requirement at issue here.[11]

Having concluded that the Town's policy is both neutral and generally applicable, all that remains as to Count I is whether the policy is rationally related to the Town's legitimate government interests. Kaloogian concedes

---

[11]    Kaloogian separately argues that, in practice, the Town selectively applied its zoning regulations, including its Conceptual Consultation invitation, by demanding review of Grace New England's proposed use of the property but not the other, secular activities that have taken place there. This argument is unpersuasive here for the same reasons that it fails to support an Equal Terms claim under RLUIPA as I discuss in greater depth below.

this point, acknowledging that "in general, the Zoning Ordinance is related to valid governmental interests" and arguing only that the Town's reasons for enforcing its Site Plan Review Regulations are insufficiently compelling to survive strict scrutiny. Doc. 38-1 at 23-24. To the extent that he maintains that the Town nonetheless lacks an interest in "refus[ing] to waive the requirements" of the Site Plan Review Regulations "without . . . a formal waiver," id. at 24, that argument, too, is without merit. It should be obvious that the Town has a legitimate interest in hearing and approving requests for waivers of its zoning regulations in publicly-noticed open meetings, "informal" as Conceptual Consultations are, Doc. 1-8 at 6. Ensuring that a municipal planning board makes its decisions through a process transparent to the public, especially where the process involves the discretionary issuance of individualized exemptions by elected officials, is of obvious importance to the government and its relationship with the public. See Swartz v. Sylvester, 53 F.4th 693, 703 (1st Cir. 2022) (describing "promoting the integrity of government institutions" as a "legitimate government interest"). At the least, if for no other reason, the Town's interest in conducting the Board's business in open meetings derives inherent legitimacy from its obligation to do so under state law. See RSA §§ 91-A:2, 673:10, 673:17; Indus. Tower & Wireless, LLC v. Town of East Kingston, 2009 DNH 127, 2009 WL 2704579, at *12 (D.N.H. Aug. 28, 2009); cf. Reyes v. N. Tex. Tollway Auth., 861 F.3d 558, 564

(5th Cir. 2017) ("Violating a state statute can be evidence that a government action is not rationally related to a legitimate government interest."). I thus conclude that the Town has a legitimate interest in issuing waivers from further review to property owners through an open, accountable process as it does. And, especially in light of the minimal burden that a Conceptual Consultation imposes on a property owner—the completion of a short form with basic identifying information and attendance at a single public meeting—I find that requiring Kaloogian's cooperative participation in that process is rationally related to that interest. Therefore, Kaloogian's challenge under the Free Exercise Clause fails.

    2.    <u>RLUIPA</u>

RLUIPA was enacted by Congress in 2000 in response to the Supreme Court's decision in <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997), which held unconstitutional RLUIPA's sister statute, the Religious Freedom Restoration Act of 1993 ("RFRA"), <u>see</u> id. at 536. <u>See</u> <u>Holt v. Hobbs</u>, 574 U.S. 352, 356-57 (2015). RLUIPA "aim[s] to ensure 'greater protection for religious exercise than is available under the First Amendment.'" <u>Ramirez v. Collier</u>, 595 U.S. 411, 424 (2022) (quoting id. at 357). Where a state or local government violates its restrictions, RLUIPA grants the victim a private cause of action against the offending government entity. <u>See</u> 42 U.S.C. § 2000cc-2(a); <u>accord</u> <u>Sossamon v. Texas</u>, 563 U.S. 277, 282 (2011).

In this case, Kaloogian invokes Section 2 of RLUIPA, which governs the regulation of land use by state and local governments as it relates to religious exercise. Doc. 1 at 22-24; see 42 U.S.C. § 2000cc. Specifically, under Count II, Kaloogian asserts that the Town's zoning enforcement violates Section 2's Substantial Burden provision, which prohibits government entities from enacting or enforcing land use regulations that substantially burden individuals' religious exercise unless the burden satisfies strict scrutiny. 42 U.S.C. § 2000cc(a)(1). In Count III, Kaloogian asserts that the Town's attempts to enforce its Site Plan Review Regulations violate Section 2's Equal Terms provision, which prohibits government entities from enacting or enforcing land use regulations that treat religious entities "on less than equal terms with" nonreligious ones. Id. § 2000cc(b)(1). For the reasons to follow, Kaloogian does not prevail under either provision.

a.    Substantial Burden

I first consider the ripe remainder of Kaloogian's claim under Count II: that requiring him to participate in a Conceptual Consultation to obtain a waiver from further review violates RLUIPA's Substantial Burden provision. In full, that provision reads as follows:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution . . . is in furtherance of a

compelling government interest; and . . . is the least restrictive means of furthering that compelling government interest.

Id. § 2000cc(a)(1). The parties do not appear to contest the threshold elements of Kaloogian's claim under the Substantial Burden test: that the Town, its zoning regulations, and Grace New England respectively qualify as a "government," "land use regulation," and "religious exercise" within the meaning of RLUIPA. See id. § 2000cc-5(4), (5), (7). Accordingly, I proceed by considering whether a Conceptual Consultation would constitute a "substantial burden" on Grace New England's religious activities.

Lacking a statutory definition of "substantial burden" in RLUIPA itself or a binding interpretation of the term from the Supreme Court, the First Circuit has adopted a multi-factor "functional approach" for determining when a land use regulation imposes a substantial burden. Roman Cath., 724 F.3d at 94-97; see Signs for Jesus v. Town of Pembroke, 977 F.3d 93, 111 (1st Cir. 2020). While careful to caution that the factors it has articulated are "not . . . an exhaustive list," Roman Cath., 724 F.3d at 96, the First Circuit consistently instructs that we should start with three in particular, see Signs for Jesus, 977 F.3d at 111. Those factors are (1) "'whether the regulation at issue appears to target a religion because of hostility to that religion itself'"; (2) "whether the regulation was 'imposed on the religious institution arbitrarily, capriciously, or unlawfully'"; and (3) "'whether local regulators

35

have subjected the religious organization to a process that may appear neutral on its face but in practice is designed to reach a predetermined outcome contrary to the group's requests.'" Id. (citation modified) (quoting Roman Cath., 724 F.3d at 96-97).

Applied in this case, all three factors weigh against finding that a Conceptual Consultation would impose a substantial burden on Grace New England's religious activities. First, as addressed above in explaining its neutrality with respect to the Free Exercise Clause, "nothing in the language" of Section V of the Site Plan Review Regulations "nor the background of" its enactment creation suggests that "hostility to" Kaloogian's Christian faith motivated how the Conceptual Consultation was designed or why it was enacted. Roman Cath., 724 F.3d at 97. As stated, Section V makes no mention of religious uses, and Kaloogian points to no evidence that animus played a role in how or why the Town crafted the requirement. Second, likewise, there is no evidence that the Town "arbitrarily, capriciously, or unlawfully" required Kaloogian to participate in a Conceptual Consultation to obtain a waiver from further municipal review.[12] Id. (quoting

---

[12]    Kaloogian argues in part that this requirement is unlawful because, in his view, it violates RSA § 674:76, the same provision of state law that forms the basis of his claim under Count IV. To the extent that his Substantial Burden claim relies on the same theory, it is not ripe. The statutory provision at issue expressly permits municipalities to apply six categories of "objective

Westchester Day Sch. v. Village of Mamaroneck, 504 F.3d 338, 350 (2d Cir. 2007)). If anything, beginning with Sawyer's initial visit to Kaloogian's property and his request that Kaloogian apply for a Conceptual Consultation, and continuing through to settlement negotiations in this litigation, the Town has endeavored to direct Kaloogian towards the standard course of zoning enforcement required of any change of use in Weare. See, e.g., Doc. 37-4 at 38 ("[Y]our request was discussed and . . . following the same path as all others, [the Planning Board] will put you on the October 24, 2024, agenda for a conceptual hearing for Grace New England." (emphasis added)). Any argument that the Town deviated from the normal course in its treatment of Kaloogian and his property is belied by the reality that this litigation essentially results from the Town's refusal to afford him the exceptional treatment that he sought, not the reverse. And third, Kaloogian presents no argument that the Conceptual Consultation sought by the Town is merely a pretext to enforce a predetermined outcome adverse to Kaloogian, nor do I find any basis from which to conclude as much.

---

and definite regulations" to religious uses of property, RSA § 674:76, and given Kaloogian's refusal to take the Town's prescribed steps to request a waiver, it would be entirely speculative to assume that a waiver, if issued upon such a request, would fail to limit the Town's inquiry to the extent required by state law.

Taken together, all three factors that the First Circuit requires me to consider in evaluating a Substantial Burden claim weigh against the conclusion that a Conceptual Consultation would substantially burden Kaloogian's religious activities, and Kaloogian does not raise any other relevant grounds on which to conclude otherwise.[13] The Town is thus entitled to summary judgment on Kaloogian's Substantial Burden claim.

### b.    Equal Terms

Next, I consider the ripe remainder of Kaloogian's claim under Count III: that requiring him to apply for a Conceptual Consultation to secure a waiver runs afoul of RLUIPA's Equal Terms provision. That provision provides:

> No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

42 U.S.C. § 2000cc(b)(1). The linchpin of an Equal Terms claim, and the only aspect contested by the parties in this case, is the "identif[ication] of a relevant secular comparator," if one exists. Signs for Jesus, 977 F.3d at 109.

---

[13]    Outside the factors identified and applied by the First Circuit in <u>Roman Catholic</u> and <u>Signs for Jesus</u>, Kaloogian also presents a more generalized argument that the breadth of Site Plan Review's maximum conceivable scope demonstrates that it is substantially burdensome. Doc. 38-1 at 27-28. The parade of horribles that Kaloogian offers in support of this argument are wholly inapposite to the ripe scope of his claim.

The comparators must be "similarly situated with respect to the purpose of
the underlying regulation," id., such that the government's differing
treatment of the religious assembly or institution and its secular comparators
may only be attributed to the former's religious nature. See id. 109-10; see
also Roman Cath., 724 F.3d at 100-01. In the zoning context, this
requirement means that the comparators be similarly situated with respect
to the same "zoning criteria." Signs for Jesus, 977 F.3d at 109 (quoting River
of Life Kingdom Ministries v. Vill. of Hazel Crest, 611 F.3d 367, 371 (7th Cir.
2010) (en banc)).

For secular comparators, Kaloogian primarily identifies other, secular
gatherings that he has hosted on his property, none of which drew the Town's
attention in the same manner as Grace New England's activities have. He
specifically points to three such events: the 2019 wedding, which drew around
100 attendees; the 2023 rally for Robert F. Kennedy, Jr., which drew around
300; and the annual commemoration of the Pine Tree Riot, which usually
draws about 150. Doc. 37-2 at 14-16. Kaloogian argues that, because the
Town did not subject these events to municipal review, whereas it demands
as much of Grace New England's activities, the Town does not treat the latter
evenly with the former and thus violates RLUIPA's Equal Terms provision.
He notes that the Review Regulations' stated purposes include: "guarding
conditions related to health and safety, protecting public welfare, and

controlling vehicle and pedestrian traffic." Doc. 38-1 at 29; accord Doc. 1-8 at 5 ("The purposes of the regulations are to . . . [p]rotect the public health, safety, welfare and prosperity . . . [as well as] accommodate existing and prospective traffic . . . ."). He contends that these concerns are implicated by the secular events just as much as Grace New England's events, and yet, when he sought the Planning Board's approval to use his barn to host the secular events, he was given "carte blanche" to do so. Doc. 41-1 at 28.

The Town's differing treatment of these purported comparators and Grace New England's activities is readily explained by a central distinction between them: the sporadic secular events that Kaloogian has hosted on his property amount to accessory uses that were only incidental to the property's residential purpose, while Grace New England's activities represent a fundamental change in the property's recurring use.[14] In view of the regulatory purposes of the Town's zoning scheme—protecting public health and safety, as well as the related goal of traffic management—the differences

---

[14]    "An accessory use is 'one which is dependent on or pertaining to the permitted principal use, i.e., a subordinate use of the property occasioned by the main use and an incident of it, rather than a principal use in and of itself.'" 15 New Hampshire Practice: Land Use Planning and Zoning, Ch. 9, Accessory Uses § 9.01 (4th ed. 2010) (quoting Becker v. Town of Hampton Falls, 117 N.H. 437, 440 (1977)). Conversely, a use that is not "minor in relation to the permitted use" or otherwise lacks "a reasonable relationship to the primary use" is not an accessory use. Id.

between these various one-off events and Grace New England's regular programming is consequential. By open invitation, Grace New England's services draw a growing number of participants at least twice a week and year-round, the result of multi-channel marketing efforts by Kaloogian and the church's parent organization. Doc. 37-2 at 19-20, 24; Doc. 37-4 at 88. Moreover, Kaloogian himself has expressed his intention that Grace New England continue to convene on his property ad infinitum, Doc. 37-2 at 20, and he has made numerous physical alterations to his property to facilitate that long-term recurrence in activity, Doc. 37-2 at 12, 19-22. Grace New England itself is likewise an incorporated legal entity of its own, bolstering the permanent trajectory of its activities for the foreseeable future. Doc. 37-3 at 73, 81, 84. These facts collectively demonstrate the nonincidental character of Grace New England's gatherings; rather than minor occasions peripheral to Kaloogian's use of his property as a residence, they reflect his long-term repurposing of it to serve as a public place of worship.

The enduring and recurring magnitude of these gatherings also distinguishes them from the smaller, unofficial religious and secular gatherings that Kaloogian raises in response, such as the Bible studies and Super Bowl parties that he hosted before affiliating with Grace International and other Weare residents' similar gatherings for "birthdays, holidays, and the like." Doc 24-2 at 3; Doc. 37-2 at 179. By design, Grace New England

draws a growing congregation to the property on a recurring basis. This regular and sizeable influx of the public raises obvious and important issues related to the Town's valid concerns about public health and safety—like ensuring adequate egress in a fire, or capable sewage management, or sufficient parking to avoid obstruction of public roadways—that smaller or less frequent gatherings simply do not trigger.

Indeed, even Kaloogian's three primary comparators do not raise these same concerns. A single wedding, a single political rally, and a once-annual community event do not represent permanent changes in the central, ongoing use of Kaloogian's property that would necessitate the Town's intervention. While the larger draw of all three may temporarily implicate some of the same regulatory concerns for public health and safety, they do not represent long-term shifts in the frequency with which those concerns are triggered that reasonably merit the attention of the Town's long-term-oriented planning and zoning processes. Instead, if it so chooses, the Town is well-equipped to manage those overlapping concerns through more temporary measures, such as event permitting.

Kaloogian counters that, like these three comparators, Grace New England's activities are merely incidental to his property's residential use. The weakness of this argument is apparent when drawn to its logical conclusion. To suggest that, notwithstanding its growing membership,

42

twice-weekly events, structural accommodation, and legal incorporation, Grace New England is indistinguishable as a matter of public health and safety from a small Bible study in Kaloogian's home is as if to say that the Town's interests are equally implicated by a professional wedding venue and a backyard wedding; a commercial consignment shop and a garage sale; a preschool and a playdate; a sports bar and a Super Bowl party; and so on. Operating a successful, well-attended church is not one and the same as privately worshipping with friends and family in one's home; while the latter commonly occurs in a home, the former seldom does.

In sum, comparing the Town's zoning enforcement with respect to Grace New England with its nonenforcement with respect to the secular events Kaloogian has hosted reveals a coherent enforcement approach driven by the distinction between quasi-permanent changes of use and those incidental activities that typify a residential use. Because Kaloogian's comparators are thus not similarly situated, his Equal Terms claim on Count III fails.

### 3.    New Hampshire Constitution

In Count V, Kaloogian asserts that the Town's conduct violates Part 1, Article 5 of the New Hampshire Constitution on essentially the same grounds that the conduct violates the Free Exercise Clause of the First Amendment. Doc. 1 at 25-26. For largely the same reasons that his Substantial Burden

claim under RLUIPA is unsuccessful, his state constitutional claim likewise fails.

Part 1, Article 5 of the New Hampshire Constitution sets forth New Hampshire's analogue to the Free Exercise Clause. In full, it provides:

> Every individual has a natural and unalienable right to worship God according to the dictates of his own conscience, and reason; and no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession, sentiments, or persuasion; provided he doth not disturb the public peace or disturb others in their religious worship.

N.H. Const. pt. 1, art. 5. While federal First Amendment doctrine may "inform and guide" how to construe this provision, the New Hampshire Supreme Court has made clear that Part 1, Article 5 reaches further than the Free Exercise Clause. State v. Mack, 173 N.H. 793, 802 (2020). Specifically, in State v. Mack, the New Hampshire Supreme Court keyed in on the provision's "substantial linguistic differences"—namely, its protection of religious practices in addition to religious beliefs under Hale v. Everett, 53 N.H. 9 (1868)—to conclude that it does not accommodate the First Amendment's "neutrality and general applicability" doctrine à la Smith and its progeny. See Mack, 173 N.H. at 814. Rather, because the New Hampshire Constitution does "not . . . distinguish between the impact of laws of general application and laws that target particular religious practices," it requires

that "government action [that] substantially burdens [an individual]'s sincere religious practice" satisfy strict scrutiny. Id. at 814-15.

Still, in Mack, the New Hampshire Supreme Court stopped short of holding that any government action conceivably applicable to a religious practice is subject to such rigorous review. Instead, the Court reaffirmed its decisions in State v. White, 64 N.H. 48 (1886), and State v. Cox, 91 N.H. 137 (1940), each of which upheld neutral and generally applicable conduct restrictions that necessarily but incidentally applied to religious applications of the restricted conduct. See Mack, 173 N.H. at 816; see also White, 64 N.H. at 49 (approving state statute banning drum-beating "within the compact part of a town," even when such beating would "form a part of the services of religious worship"); Cox, 91 N.H. at 510-12 (affirming misdemeanor convictions of Jehovah's Witnesses who marched in a religious procession in violation of state statute banning unlicensed parades). What rendered these restrictions' burdens on religious practices insubstantial and thus exempt from strict scrutiny, according to the Court, was their "limited scope" and "the fact that both statutes expressly provided that anyone could apply for and obtain a license, permit, or other lawful permission to engage in the conduct at issue." Mack, 173 N.H. at 816.

Close review of the process to obtain a waiver via Conceptual Consultation makes plain that its burden on a property owner like Kaloogian

45

is similarly insubstantial. As discussed, there are essentially two steps to a Conceptual Consultation. To initiate the process, a property owner need only complete the one-page application that Sawyer presented to Kaloogian during his August 2023 visit to Kaloogian's property. Doc. 37-4 at 15. This form asks for no more than the Planning Board needs to know to understand the applicant's request: basic identifying information about the property, summaries of its existing and proposed uses, its effect on certain public infrastructure, and any variances or special exceptions already applicable. See id. Next, the Board reviews the application in a public meeting at which the applicant's presence is required. See Doc. 37-2 at 188. Assuming the Board agrees with the applicant's request for a waiver, he will likely leave that meeting with one (figuratively) in hand. See id.

Beyond that, the Site Plan Review Regulations require nearly nothing else from a waiver applicant. Quite the contrary, Section V expressly cabins the Conceptual Consultation to "[a] discussion in conceptual form and general terms only." Doc. 1-8 at 6 (emphasis added). There is no fee to apply, the use of "development plans . . . as part of the discussion" is forbidden, and "it is not necessary to make formal notice to abutters and other applicable individuals." Id. at 6-7. Truly, all that it takes for a meritorious applicant to secure a waiver is answering one page of non-substantive questions and attending a single public meeting—precisely the kind of insubstantial

licensure process that the New Hampshire Supreme Court endorsed as lawful under its precedent interpreting Part 1, Article 5. See Mack, 173 N.H. at 816. Thus, requiring Kaloogian to submit to that process here does not violate that provision of the New Hampshire Constitution.

   4.   RSA § 674:76

In Count IV, Kaloogian asserts that the Town's requirement that Kaloogian seek a waiver from the site plan Review Regulations violates RSA § 674:76, a recently enacted addition to New Hampshire's Title LXIV, which authorizes and governs municipal planning and zoning regulation in New Hampshire. See generally RSA § 672-79; Doc. 1 at 24. In full, RSA § 674:76 provides as follows:

> No zoning ordinance or site plan review regulation shall prohibit, regulate, or restrict the use of land or structures primarily used for religious purposes; provided, however, that such land or structures may be subject to objective and definite regulations concerning the height of structures, yard sizes, lot area, setbacks, open space, and building coverage requirements as long as said requirements are applicable regardless of the religious or non-religious nature of the use of the property and do not substantially burden religious exercise.

RSA § 674:76. Given that RSA § 674:76 is only three years old, no court has yet had occasion to interpret its scope. Among the critical questions yet unanswered about the provision, which would require resolution to adjudicate Kaloogian's claim, are (1) whether a party who is basing a claim for relief on RSA § 674:76 may present a claim for relief in court without

complying with the judicial review process specified in RSA § 677:45; and (2) if so, whether, as Kaloogian asserts, RSA § 674:76 can be used to completely bar Site Plan Review of a proposed religious use of property when, by its plain terms, it appears to expressly authorize review of such uses based on certain types of "objective and definite regulations." Id.

As is the case with any claim arising entirely under state law between nondiverse parties, my jurisdiction over this claim is solely supplemental. See 28 U.S.C. § 1367(a). Supplemental jurisdiction is discretionary, and I am free to decline to exercise it when, among other reasons, a claim "raises a novel or complex issue of State law." Id. § 1367(c)(1); see Signs for Jesus, 977 F.3d at 114; Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) (identifying as a "factor to be weighed" in assessing whether to exercise supplemental jurisdiction "the clarity of the law that governs a pendent claim, for a federal court may be wise to forgo the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application"); Senra v. Town of Smithfield, 715 F.3d 34, 41 (1st Cir. 2013) (suggesting that questions of state law could conceivably be "so novel as to warrant the added time and expense inherent in a remand to state court"). In exercising that discretion here, I conclude that the initial interpretation of RSA § 674:76—a structure of exemptions with exceptions

unique in New Hampshire law—is best left to the New Hampshire Supreme Court, and I dismiss Count IV without prejudice.

## IV.  CONCLUSION

For the reasons explained above, I decline to exercise supplemental jurisdiction over Count IV and dismiss that claim without prejudice. Kaloogian's remaining claims are ripe only to the extent that they apply to the Town's demand that he participate in a Conceptual Consultation. As to Kaloogian's ripe claims, the Town is entitled to summary judgment and Kaloogian's motion for summary judgment is denied. These rulings are without prejudice to Kaloogian's right to renew his unripe claims if they become ripe in the future.

As the parties decide on their next steps, it is worth noting that their disagreements may be less significant than they appeared to be at the outset of this litigation. First, Kaloogian has a right under the Zoning Ordinance to operate a church on his property, and the Town does not contend otherwise. Second, the Town has the power to enforce building and safety codes with respect to the church's operations, and Kaloogian does not challenge the Town's authority to fulfill that duty. Finally, as the Town recognizes, RSA § 674:76 limits its authority to regulate the church's activities during Site Plan Review to "objective and definite regulations concerning the height of structures, yard sizes, lot area, setbacks, open space, and building coverage

requirements." While there may well be limited areas within the permissible scope of the Town's regulatory authority where the parties may continue to disagree, this Memorandum and Order will hopefully provide the parties with the guidance they need to resolve any remaining issues by agreement.

The clerk shall enter judgment in accordance with this Memorandum and Order and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

November 10, 2025

cc:    Counsel of Record